ANDERSON DAIRY, INC., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 89554, 89553, 89552. Filed March 26, 1963.

*Joseph D. Peeler, Esq.,* and *Frederick B. Warder, Jr., Esq.,* for the petitioners.

*David R. Brennan, Esq.,* for the respondent.

FAY, *Judge:* Respondent determined deficiencies in petitioners' income taxes for the years and in the amounts as follows:

---

[1] Proceedings of the following petitioners are consolidated herewith: Kenny Searles and Mildred Searles, Docket No. 89553; Donald I. Ferguson and Tilla G. Ferguson, Docket No. 89552.

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 89554 | Anderson Dairy, Inc. | Fiscal year ended Apr. 30, 1955 | $162,795.20 |
| | | Fiscal year ended Apr. 30, 1956 | 118,318.73 |
| | | Fiscal year ended Apr. 30, 1957 | 95,755.89 |
| | | Fiscal year ended Apr. 30, 1958 | 136,777.46 |
| 89553 | Kenny Searles and Mildred Searles | 1956 | 10,406.69 |
| | | 1957 | 30,472.09 |
| 89552 | Donald I. Ferguson and Tilla G. Ferguson | 1956 | 1,580.75 |
| | | 1957 | 3,674.62 |
| | | 1958 | 2,354.80 |

As to the individual petitioners, the only issue for decision is whether the gain realized by petitioners upon the disposition of certain assets used in their trade or business is taxable as long-term capital gain, as reported by the petitioners, or is taxable as ordinary income, as determined by the respondent.

As to the corporate petitioner, there are two issues for decision: First, whether the petitioner Anderson Dairy, Inc., is entitled to deduct as rent any part of the amounts it paid to the University Hill Foundation; and second, whether certain payments by Anderson Dairy, Inc., to Kenny Searles and Donald I. Ferguson are in the nature of interest and therefore deductible.

### FINDINGS OF FACT.

Some of the facts have been stipulated and they are found accordingly.

Petitioners Kenny Searles and Mildred Searles are husband and wife now residing in Las Vegas, Nev. They filed joint income tax returns for the years 1956 and 1957 with the district director of internal revenue at Reno, Nev.

Petitioners Donald I. Ferguson and Tilla G. Ferguson are husband and wife now residing in Las Vegas, Nev. They filed joint income tax returns for the years 1956, 1957, and 1958 with the district director of internal revenue at Reno, Nev.

On September 1, 1945, petitioner Kenny Searles (hereinafter referred to as Searles) executed an agreement pursuant to which petitioner Donald I. Ferguson (hereinafter referred to as Ferguson) became a partner of Searles and received a 25-percent interest in the capital, profits, and losses of the business operating under the name Anderson Dairy, which prior to this time had been operated as a sole proprietorship by Searles. Under the agreement Ferguson agreed to pay Searles $100,000 for his 25-percent interest.

The land and building on which the Anderson Dairy partnership conducted its operation were owned by Searles and his wife. Under the agreement of September 1, 1945, Ferguson acquired no interest in said land and building. The land was originally acquired by

Searles in 1941 and shortly thereafter he erected a building thereon. In 1950 and 1951 the building was enlarged considerably. Prior to 1952 the building was rented by the Anderson Dairy partnership at a rental of $500 per month. As of January 1, 1952, the rent was increased to $1,100 per month.

The Anderson Dairy partnership was engaged in the business of conducting a general dairy "and also in buying, selling and retailing all sorts of wares, goods, merchandise and commodities, and all kinds of produce usually kept and sold in a dairy." During the years 1949 through the first 4 months of 1954, the Anderson Dairy partnership had net sales and realized net income therefrom per books, as follows:

| Calendar year | Net sales | Net income |
|---|---|---|
| 1949 | $967,943.35 | $60,931.84 |
| 1950 | 1,189,400.98 | 83,539.93 |
| 1951 | 1,439,540.63 | 146,166.50 |
| 1952 | 1,741,996.41 | 156,691.82 |
| 1953 | 2,176,060.58 | 212,876.82 |
| 1954 (4 months) | 752,120.86 | 99,713.98 |

The net worth of the Anderson Dairy partnership at the beginning of each of the calendar years 1949 through 1954 was as follows:

| January 1— | Net worth |
|---|---|
| 1949 | $113,946.59 |
| 1950 | 102,530.22 |
| 1951 | 92,874.29 |
| 1952 | 97,410.33 |
| 1953 | 105,249.71 |
| 1954 | 158,410.63 |

Prior to 1954 Searles was general manager of the Anderson Dairy partnership and worked full time at said occupation. In the early part of 1954 Searles, because of the condition of his health, decided to sell the Anderson Dairy partnership assets. He discussed the matter with Ferguson, who agreed to go along with such a sale. In an effort to find a buyer, Searles went to Los Angeles in February 1954 and contacted Arden Farms Dairy. However, the negotiations with Arden Farms Dairy terminated shortly thereafter when Searles learned that Arden Farms Dairy was only interested in a stock transaction. Searles next contacted Beatrice Foods Co., which already had some operations in Las Vegas. During March 1954 several representatives of Beatrice Foods Co. spent 2 days in Las Vegas negotiating with Searles for the purchase of all the business and assets owned by the Anderson Dairy partnership. The financial records, plant, and equipment were inspected by the Beatrice Foods representatives. The plant was found to be modern and the equipment was in excellent condition. The representatives of Beatrice Foods Co. advised Searles

that the business and assets of the Anderson Dairy partnership, exclusive of land and building, were worth $1 million and that if a deal could be made it would be effected on that basis. It became apparent, however, that the proposed purchase of the Anderson Dairy assets would pose certain problems for Beatrice Foods, namely, what effect the purchase would have on its distributor already in the area, what effect the acquisition would have on its other producing plants, and whether the boom in the Las Vegas area was only temporary. As a result of these problems, Beatrice Foods Co. decided not to pursue the purchase of the Anderson Dairy partnership.

Shortly thereafter Searles went to South Gate, Calif., to consult with his longtime friend James E. Bahan (hereinafter referred to as Bahan). Bahan had also been in the dairy business for many years and at the present time was president of Royal Farms Dairy Co., a company engaged in the operation of a large creamery business near Los Angeles. Searles informed Bahan of his previous negotiations and asked for advice. Bahan asked Searles if he would be interested in selling a one-half interest in the Anderson Dairy partnership to him if he furnished the complete management. Searles stated that he might consider such a proposal. Searles returned to Las Vegas to consider Bahan's offer. A short time later Searles called Bahan and asked him to come to Las Vegas. In April 1954 Bahan, his brother, and their accountant went to Las Vegas in response to Searles' call. Bahan and his group spent 2 days in Las Vegas, during which time they inspected the Anderson Dairy partnership plant and equipment as well as pertinent financial statements of the partnership. Bahan and his brother understood that the contemplated sale involved only the assets of the Anderson Dairy partnership and did not include the land and building owned by Searles, individually. During the negotiations between Bahan and Searles, Bahan suggested that Searles might be interested in making a sale to the University Hill Foundation (hereinafter referred to as the Foundation) similar to the one he had recently made in connection with Royal Farms Dairy Co. Bahan's accountant then explained to Searles the manner in which a transaction with the Foundation was handled.

The Foundation transaction was explained to Searles as follows: The Foundation would enter into a purchase agreement, agreeing to purchase the assets and goodwill of the business; the Foundation would then lease these assets to an operating company in which the sellers would be permitted to own only 48 percent of the stock; the remaining 52 percent would be held by outsiders and the Foundation; the lease between the Foundation and the operating company would provide that 80 percent of the latter's profits were to be paid as rent to the Foundation; the Foundation would then pay 90 percent of these

rents to the sellers to be applied against the purchase price; and finally, during the first 10 years the agreement was in effect the Foundation would pay no interest on its indebtedness to the sellers.

Searles then stated that he wanted to find out more about the Foundation. However, before returning to Los Angeles Bahan entered into an informal agreement with Searles to the effect that if the Foundation transaction was not consummated then Searles and Ferguson would sell a one-half interest in the Anderson Dairy partnership to Bahan. The agreed price was $450,000. The sum of $116,000 was to be paid when the deal was made with the balance payable over 5 years, with interest. Searles made it understood that Bahan was to furnish the management in the event of such a sale.

The Foundation is a nonprofit corporation and was organized under the laws of the State of California on April 26, 1945. In 1954 its board of directors consisted of C. Kevin Malone, J. P. Carroll, and Paul R. Cote. Its principal representatives were Paul R. Cote, president, and Malone. The Foundation is approved by the Jesuit Order and its sole purpose was to supply financial assistance to Loyola University. On November 19, 1946, the Commissioner issued a ruling which granted tax-exempt status to the Foundation. On April 4, 1956, the tax-exempt status of the Foundation was revoked retroactively to the fiscal year ended April 30, 1952. The assets, liabilities, and net worth of the Foundation per its books were as follows:

|  | Apr. 30, 1953 | Apr. 30, 1954 |
|---|---|---|
| Assets | $27,812,797.49 | $30,573,983.39 |
| Liabilities | 19,020,859.55 | 20,717,777.29 |
| Net worth | 8,791,937.94 | 9,856,206.10 |

After returning from Las Vegas, Bahan and his accountant, who was also the accountant of the Foundation, contacted Malone and Cote and discussed the Anderson Dairy matter with them. Malone was given a schedule prepared by the accountant containing rough estimates of the following: The projected income of the Anderson Dairy partnership for the year 1954, the rental which the Foundation could expect to receive under the proposed lease agreement, the amount it would be required to pay the sellers under the purchase agreement, and the period of estimated payoff of the purchase obligation. Malone expressed an interest in the transaction but deferred definite comment until he could examine the financial data in detail and discuss the matter with Cote.

In the meantime Searles contacted his attorney, his banker, and several other persons in order to obtain information regarding the Foundation and the legality of the proposed transaction. Searles was informed by the various persons contacted that the reputation of the

university was of the highest caliber and that the transaction was entirely legal.

After reviewing the financial material submitted to them, Malone and Cote decided to visit the Anderson Dairy plant in Las Vegas. A trip was arranged and several days later Malone, Cote, Bahan, and their accountant arrived in Las Vegas. During the course of negotiations, Malone offered Searles $900,000 for the goodwill and depreciable assets of the Anderson Dairy partnership. The $900,000 purchase price did not include the land and building owned individually by Searles and was to be paid under an arrangement whereby the purchase price was to be paid out of rents with no interest on the unpaid balance. Searles stated that the offer was unsatisfactory and countered with a figure of $1,100,000. The negotiations terminated at this point and the representatives of the Foundation returned to Los Angeles.

Within a day or two, Foundation representatives informed Searles that they could probably get together on the Anderson Dairy partnership price but if the transaction was to be completed they would have to own the land and building as well. They then offered Searles $200,000 for the land and building.

Because Searles had not intended prior to this time to sell the land and building, he was required to obtain the advice of a local banker and an engineer in an effort to ascertain what his land and building were worth at that time. Based on his discussions with these individuals, Searles determined that his land and building were worth $300,000.

Negotiations with representatives of the Foundation were resumed, and eventually the parties agreed that the purchase price for the Anderson Dairy partnership assets was to be $1 million and the purchase price of the land and building owned by Searles, individually, was to be $250,000.

Once the parties agreed upon a purchase price, the format of the transaction was dictated by the Foundation. It was understood by the parties that the title to the Anderson Dairy partnership assets involved in the transaction, as well as Searles' land and building, was to be transferred to the Foundation, that a new corporation was to be formed, that this corporation was to lease the Foundation's newly acquired assets for 5 years, that the management of the new corporation was to be furnished by Bahan or Searles, and that the sellers or their nominees could not own more than 48 percent of the stock of the operating company.

On April 26, 1954, the board of directors of the Foundation met. Cote presented the terms of the proposed transaction with the Anderson Dairy partnership to the board and the board discussed the terms in detail. Cote explained that based on the past and projected income

figures of Anderson Dairy it was estimated that Searles and Ferguson would be paid off in between 8 and 10 years. After the discussion, the board of directors of the Foundation authorized its officers to execute the purchase agreement with Searles and Ferguson and to execute any other related documents.

On April 30, 1954, the purchase agreement was executed by Searles and Ferguson (and their respective spouses) as sellers and by the Foundation as buyer. The agreement provided for the sale of certain real estate and improvements, certain depreciable equipment and the name, goodwill, customers lists, and routes of the Anderson Dairy partnership for a total purchase price of $1,250,000, payable in the manner, at the times, and from the sources specifically set forth. The sum of $15,000 was payable concurrently by buyer to sellers, leaving a balance of $1,235,00. Other pertinent provisions of the agreement were as follows: Buyer agreed to execute a lease to a lessee corporation of buyer's selection to operate the business formerly conducted by sellers and to lease to it all the assets acquired under the purchase agreement. Buyer also agreed to require a lease deposit from the lessee and to pay the amount thereof as further payment on the purchase price. The lease required as rent the payment of 80 percent of the net profits from the operation of the business, before deduction of income or other similar taxes. Buyer was to pay to sellers to apply on the unpaid balance of the purchase price 90 percent of all rental received until sellers had been paid in full, provided that the entire balance of the purchase price, if not sooner paid, was to become due and payable on May 1, 1964. The unpaid balance was to bear no interest except after maturity and then only at the rate of 4 percent per annum. In the event buyer during the calendar year 1955 or any calendar year thereafter did not pay to sellers payments totaling $50,000 during any calendar year, sellers were to have the option of accelerating the unpaid balance and to declare a default. Buyer was obligated to make payment of the purchase price only out of the rental received or from the proceeds of sale of any assets acquired by buyer from sellers not reasonably required in the operation of the business, which was not to be sold without the written consent of sellers. In the event of the failure of buyer to cure a default, sellers could, at their option, declare the entire balance due and payable and proceed to enforce payment from the collateral held by sellers as security, but only out of said collateral. If at any time the real property was not required in the business, sellers Searles and his wife were to have an option to repurchase said real property for the sum of $250,000 less an amount equal to $1,100 per month for the intervening period. Buyer did not authorize the lessee to incur expenses chargeable to buyer's rental account for any capital improvements or additions dur-

ing any quarterly period in excess of $5,000, without the written consent of sellers.

On this same day, the sellers transferred to the Foundation, by bill of sale and assignment, the depreciable equipment and the name, goodwill, customers lists, and routes of the Anderson Dairy partnership. On May 1, 1954, the sellers received from the Foundation as security a chattel mortgage on the depreciable equipment.

Pursuant to the purchase agreement, Searles and his wife transferred to the Foundation the real property sold thereunder by a grant, bargain, sale deed dated May 1, 1954. As security for the payment of the purchase price, they received from the Foundation a deed of trust on said property dated May 1, 1954.

The cash or equivalent fair market value on April 30, 1954, of all assets transferred to the Foundation by Searles and Ferguson was $945,000. Of this amount, the tangible assets, including the land and building, had a cash or equivalent fair market value of $495,000 and the intangible assets had a cash or equivalent fair market value of $450,000.

Anderson Dairy, Inc. (hereinafter referred to as Anderson), was incorporated under the laws of the State of Nevada on April 28, 1954, and had as its principal purposes the ownership and operation of a dairy business. The articles of incorporation provided that the corporation was to have one class of stock consisting of 10,000 shares with no-par value.

At the first meeting of the board of directors of Anderson, Searles, Ferguson, Bahan, and one Stanley Sponholz were elected as directors of Anderson. In addition, Searles was elected president, Bahan and Sponholz were elected vice presidents, and Ferguson was elected secretary-treasurer. Although Searles was elected president, he was not expected to take, nor was it contemplated that he would take, an active interest in the affairs of Anderson. The board of directors also passed a resolution which provided that Sponholz and Ferguson were to be hired as comanagers of Anderson. Sponholz actually served as general manager while Ferguson served as office manager. Sponholz and Ferguson were each paid $750 per month for the performance of their duties.

Sponholz, who had some experience in the dairy business, was acquainted with Bahan, and it was the latter who recommended that he be selected as a manager of Anderson.

On May 1, 1954, the board of directors of Anderson authorized its officers to execute a lease agreement with the Foundation. Under date of May 1, 1954, the Foundation as lessor and Anderson as lessee entered into a lease covering all the properties specified in the previously executed purchase agreement between the Foundation and Searles

and Ferguson. The lease was for a term of 5 years and contained no provision for renewal. Furthermore, there was no informal understanding between the lessor and lessee concerning a renewal of the lease, other than that if the management of Anderson operated the corporation properly and made a profit the lease would probably be renewed. The principal provisions of the lease were as follows: Lessee agreed to pay as rental an amount equal to 80 percent of the net profits resulting from the use of the premises in the operation of the business until a total of $1,400,000 had been paid, after which the rental would be an amount equal to 60 percent of the net profits. In the event that during the calendar year 1955 or any calendar year thereafter lessee did not pay as rental at least $60,000, lessor could at its option cancel the lease. Lessee was to exert its best efforts to cause the demised premises to be productive of the highest possible net profits consistent with good business judgment and sound, efficient, and economical operations, but the rentals were to accrue only in the event that net profits were earned. Lessee alone was to bear any and all losses incurred in the operation of the business. Lessee was to maintain the premises in a good state of repair and make capital improvements, with the costs to be credited upon rental, provided they did not exceed $5,000 per quarter without the written consent of lessor. Lessee was to pay all property taxes and fully insure the properties. In the event of damage, the proceeds of insurance policies were to be used to restore the premises and any excess costs were to be treated as an expense of operation. The lease could not be assigned or sublet without the written consent of lessor. At all times during the continuance of the lease at least 60 percent of the outstanding stock was to be held only by such persons as were approved by lessor. Lessor was the owner of the name and goodwill of Anderson Dairy and lessee was given the right to use said name in the conduct of its business during the term of the lease. The lease was subject to the purchase agreement dated April 30, 1954, and to various collateral and mortgage agreements. In the event of bankruptcy proceedings, the lease was to terminate immediately. Lessee had paid to lessor the sum of $50,000 as security, and in the event of full compliance lessor was to repay to lessee the amount of said deposit, without interest. Upon the expiration or sooner termination of the lease, lessee was, at the option of lessor, to assign to lessor all contracts or orders that were assignable.

On April 30, 1954, the Foundation executed to Searles and Ferguson an assignment of lease, covering the aforementioned lease, as security for the performance of its obligations under the purchase agreement.

On May 1, 1954, Searles and Ferguson executed a bill of sale transferring to Anderson the inventory and supplies which previously

were the property of the Anderson Dairy partnership. The purchase price of $73,884.91 was set up as an account payable to Searles and Ferguson on the books of Anderson.

Searles during the first year of Anderson's existence took no active interest in its affairs and received no salary from it. On occasion during the first year Searles did entertain some customers of Anderson and for this he was allowed an expense account. In May 1955 due to increased competition, Searles was requested to give more help to Anderson. By this time Searles' health had improved somewhat and he agreed to devote more time to Anderson. Thereafter he assisted Sponholz and received a salary of $500 per month for his part-time activities. In November 1955 Searles became a full-time employee of Anderson and was paid a salary of $1,000 per month.

Although Bahan was an officer of Anderson, maintained an active interest in its business, and participated in major management decisions, he received no salary.

There were no employment contracts between Anderson and its employees.

By a check dated May 5, 1954, Royal Farms Dairy paid to Anderson $69,000 for the issuance of stock to Bahan, his brother Joseph, Stanley and Maria Sponholz, Edward Murphy, and Joseph Schneider. The $69,000 payment was reflected on the books of Royal Farms Dairy as an account receivable from such persons, who subsequently reimbursed that company. The Anderson Dairy partnership on May 6, 1954, issued its check for $72,000 to Anderson in payment of stock issued to Searles, Searles' son, Ferguson, and one George E. Mimms. On May 14, 1954, Cote sent checks to Anderson in payment of the stock issued to Mildred L. Spencer, Richard L. Walker, Paul R. Cote, Jr., and Mimi Corcoran.

The stock of Anderson was thereafter held by the following persons:

| Date issued | Number of shares | Party to whom issued |
|---|---|---|
| July 1, 1954 | 2,450 | Kenneth M. Searles (president of Anderson Dairy, Inc.). |
| Do | 1,000 | Kenneth D. Searles (son of Kenneth M. Searles). |
| Do | 1,150 | Donald Ferguson (secretary-treasurer of Anderson Dairy, Inc.). |
| Do | 200 | George E. Mimms (employee of Anderson Dairy, Inc.). |
| Aug. 6, 1954 | 200 | Herbert M. Jones (attorney for Anderson Dairy, Inc.). |
| July 1, 1954 | 500 | Stanley R. Sponholz (vice president and manager of Anderson Dairy, Inc.). |
| Do | 500 | Maria K. Sponholz (mother of Stanley R. Sponholz). |
| Do | 200 | Edward Murphy (employee of Royal Farms Dairy Co.). |
| Do | 200 | Joseph Schneider (certified public accountant and vice president of Royal Farms Dairy Co.). |
| Do | 1,500 | James E. Bahan (vice president of Anderson Dairy, Inc., and president of Royal Farms Dairy Co.). |
| Do | 1,500 | Joseph R. Bahan (secretary-treasurer of Royal Farms Dairy Co.). |
| Do | 100 | Mary M. Corcoran (daughter of Paul R. Cote). |
| Do | 100 | Paul R. Cote, Jr. (son of Paul R. Cote). |
| Do | 100 | Mildred J. Spencer. |
| Do | 100 | Richard L. Walker. |
| Do | 100 | Joseph Lamar Foremaster (employee of Anderson Dairy, Inc.). |
| Do | 100 | J. Glen Coon (employee of Anderson Dairy, Inc.). |

After it started operations on May 1, 1954, Anderson had approximately 40 percent of the creamery business in Las Vegas.

In February 1956 Sponholz, because of his dislike of living conditions in Las Vegas, severed his employment with Anderson; his duties were assumed for the most part by J. Glen Coon, an Anderson employee.

During the taxable years involved herein, representatives of the Foundation received detailed periodic financial reports from Anderson and made frequent trips to the Anderson plant to inspect its operations.

Sometime in the fall of 1954, Searles learned that Bert O'Donnell, the principal partner in a business known as Rancho Grande Creamery (hereinafter referred to as Rancho), was negotiating with Arden Farms for the sale of Rancho. At this time Rancho was the second largest creamery in Las Vegas and had about 15 percent of the Las Vegas creamery business. The presence of Arden Farms in Las Vegas would have created a definite competitive problem for Anderson. Searles called Bahan and told him that he was going to contact O'Donnell. Thereafter Searles contacted O'Donnell and asked him if he were interested in selling his business. O'Donnell replied that he was. Searles then suggested to O'Donnell that a meeting be set up with representatives of the Foundation in order to afford the Foundation an opportunity to discuss the matter with him. O'Donnell agreed, and Searles arranged a meeting with the Foundation. The meeting took place several days later and was attended by O'Donnell, Searles, Cote, and Malone. Negotiations were commenced and eventually O'Donnell agreed to sell the assets of Rancho to the Foundation for $350,000. The purchase agreement was executed on October 31, 1954, and provided in principal part that O'Donnell was to receive $7,500 in cash, the balance to be paid within 5 years without interest; that the balance was payable only out of 25 percent of 90 percent of the rentals received by the Foundation under an amended lease to be executed with Anderson or out of proceeds of sales of assets acquired from Rancho; that a minimum payment of $25,000 in each calendar year was to be made to O'Donnell; and that O'Donnell was given an option to purchase the real property for $11,000 within 60 days after April 30, 1962. The option could not be exercised prior to April 30, 1962.

O'Donnell considered Anderson an aggressive and profitable company but feared that as a result of the sale Anderson would assimilate all the Rancho assets and customers so that in the event of a default he would not be able to realize much on his security. Accordingly, as an integral part of the purchase transaction O'Donnell insisted that Searles and Bahan personally guarantee to pay him whatever amount

was necessary to provide him with a receipt of at least $50,000 per year on the purchase by the Foundation, irrespective of the net profits of Anderson, and to pay the balance of the purchase price on or before November 1, 1959, if not paid by the Foundation. Malone informed Searles and Bahan that it was all right for them to give the guaranty since the Foundation would definitely pay O'Donnell off in 5 years and that Searles and Bahan "would not be stuck." Relying on Malone's word, Searles and Bahan executed the requested indemnity agreement on October 31, 1954.

On October 31, 1954, Rancho transferred the real estate and the other assets covered by the purchase agreement to the foundation. On November 1, 1954, the Foundation transferred the net current assets of Rancho to Anderson in exchange for the latter's note in the amount of $123,534.32, payable with interest at 4 percent before November 1, 1958.

Incident to the Rancho purchase, the Anderson lease from the Foundation was amended as of November 1, 1954, to include as leased assets the Rancho assets other than the current assets for which Anderson gave its promissory note. The lease was also amended to raise the amount of quarterly capital expenditures which Anderson could make without the written consent of Searles and Ferguson to $7,500 per quarter. In addition, and by reason of the Rancho purchase, the purchase agreement between the Foundation and Searles and Ferguson was amended as of October 31, 1954, to provide that only 75 percent of the 90 percent of rentals received by the Foundation from Anderson were to be paid to Searles and Ferguson on the purchase price instead of the full 90 percent and that $7,500 per quarter could be expended by Anderson for capital improvements and charged against rentals payable to the Foundation without the written consent of Searles and Ferguson.

On November 8, 1956, the board of directors of Anderson passed a resolution whereby the personal guaranty of Searles and Bahan to O'Donnell was assumed by Anderson.

During the fiscal year ended April 30, 1960, final payment of the purchase price of the Rancho assets was made by the Foundation with $100,675.33 supplied out of its own funds and with $35,361.08 supplied by Anderson. The Anderson note to the Foundation was credited with the amount advanced by Anderson to pay off O'Donnell. After O'Donnell was paid, the Foundation became subrogated to the portion of the rentals which previously were payable to him. The subrogation was to last until such time as the money the Foundation had paid to O'Donnell was recouped.

Although the parties could reasonably foresee that Anderson would need to make capital expenditures for new equipment from time to

time, as of April 30, 1954, the parties did not believe that capital improvements in excess of $5,000 per quarter would be required. However, the acquisition of Rancho, coupled with the rapid growth of the Las Vegas area, created a situation whereby the existing facilities at Anderson became inadequate. The Foundation refused to construct a new plant, so Searles and Bahan decided to finance the construction of a new plant and to lease it to Anderson. Searles and Bahan thereafter acquired land at a cost of approximately $100,000 and erected a building and improvements thereon at a cost of approximately $440,000. After the new dairy plant was completed, the Foundation refused to invest in the new plant although it was requested to do so by Searles, for the following reasons: The Foundation, Searles, and Bahan could not agree as to price; Searles and Bahan wanted a repurchase option; the Foundation was concerned about its tax-exempt status; and since the new plant was no good without the equipment and intangible assets such as trade name, customers lists, etc., which the Foundation owned, the Foundation saw no reason to invest in the building. On May 1, 1956, Bahan and Searles, as lessors, entered into a lease with Anderson which provided for the use of said properties by Anderson for a period of 3 years at a rental of $4,200 per month.

The old building thereafter remained vacant for about 2 years. On or about May 1, 1958, the purchase agreement between Searles, Ferguson, and the Foundation and the lease between the Foundation and Anderson were amended for the second time. Under the amendment, the Foundation agreed to make improvements to remodel the old dairy plant and convert it into office and store facilities. Searles agreed to waive the option to repurchase the property and both Searles and Ferguson agreed to defer payments on the purchase price obligation to the extent of the rents obtained on said building until the Foundation recovered the cost to it of the improvements. The Foundation subsequently expended between $83,000 and $85,000 to remodel the old plant.

Because of the tremendous growth of Las Vegas, which growth was not anticipated by Searles, Ferguson, and the Foundation at the time the original purchase agreement was executed, it soon became apparent that Anderson would need to expend amounts in excess of $5,000 [2] per quarter for additional equipment in order to keep pace with the increasing population. It was also essential that Anderson be permitted to charge such expenditures against the rentals due the Foundation. In order for Anderson to spend sums in excess of the quarterly limitation and to charge them against the rental payments, it was required by its lease to obtain the permission of the Founda-

---

[2] This figure was later amended to $7,500.

tion. The Foundation, in turn, was not permitted by reason of its purchase agreement with Searles and Ferguson to grant such permission to Anderson without first obtaining the consent of Searles and Ferguson. Because the expenditures were essential if Anderson was to continue its profitable operation and to maintain its payments to the Foundation, Searles and Ferguson stood to obtain a pecuniary benefit by giving their consent to any excess expenditure. A decrease in Anderson's business would ultimately decrease the amounts received by Searles and Ferguson in amortization of the purchase price.

During the period between June 15, 1954, and March 15, 1955, Anderson made three requests to exceed its capital expenditure limitation. In each instance the consents of the Foundation and Searles and Ferguson were obtained.

Sometime around May 1955, the accountant for Anderson, who was also the accountant for Searles and Ferguson, stated to Searles that Searles should receive interest on the payments to him which were being deferred due to the excess capital expenditures by Anderson. On May 10, 1955, the board of directors of Anderson met and passed a resolution providing that interest at the rate of 5 percent per annum be paid by Anderson to Searles and Ferguson on the amounts by which their purchase money payments from the Foundation had been reduced by Anderson's capital expenditures in excess of the amounts permitted by the lease and purchase agreements. Thereafter, pursuant to the foregoing resolution, Anderson paid to Searles and Ferguson the following sums:

| Fiscal year ended— | Total amount |
| --- | --- |
| 1956 | $6, 009.14 |
| 1957 | 5, 712.67 |
| 1958 | 8, 605.02 |

Anderson deducted these amounts on its respective income tax returns as interest. The respondent disallowed the deduction.

On May 1, 1959, a lease was executed by the Foundation as landlord and Anderson as tenant for a term of 3 years, covering the assets held under the previous lease. The terms were similar to those in the old lease. Likewise, on May 1, 1959, Bahan and Searles as lessors and Anderson as lessee executed a lease covering the land and building used by Anderson for a term of 5 years at a rental of $4,200 per month. By letter dated April 18, 1962, the lease dated May 1, 1959, between the Foundation and Anderson was extended for 1 year.

Anderson filed its income tax returns for the fiscal years ended April 30, 1955, 1956, 1957, and 1958 with the district director of internal revenue at Reno, Nev.

Anderson during the fiscal years ended April 30, 1955, 1956, 1957, and 1958, reported net income after taxes of $42,911.89, $29,215.28, $25,065.77, and $31,762.85, respectively.

Anderson accrued and deducted on its income tax returns for the aforementioned years the following amounts which were paid to the Foundation pursuant to the terms of the lease:

| Fiscal Year— | Amount accrued |
|---|---|
| 1955 | $311,765.71 |
| 1956 | 221,663.94 |
| 1957 | 179,154.49 |
| 1958 | 254,051.18 |

The respondent disallowed these deductions.

During the period from May 1, 1954, to date of trial, the total percentage of rentals accrued by Anderson was $2,016,507.58, of which $844,076.98 was paid through the purchase of additional equipment and $1,172,430.60 was paid in cash. The Foundation retained $117,243.08 and paid to Searles and Ferguson a total amount of $894,408.53 on account of the purchase price of $1,250,000, as follows:

| Source of payment | Amount |
|---|---|
| Downpayment | $15,000.00 |
| Security deposit from lessee | 50,000.00 |
| Rentals and proceeds of assets sales | 829,408.53 |
| Total payments | 894,408.53 |

The balance of the purchase price due to Searles and Ferguson on October 11, 1962, was $355,591.47.

During 1956 and 1957 the petitioners Searles reported on their income tax returns as gain realized on the receipt of payments of the purchase price from the Foundation the following amounts:

| Year | Total payments received | Gain reported | |
|---|---|---|---|
| 1956 | $40,990.40 | Short term | $951.55 |
| | | Long term | 32,502.75 |
| 1957 | 76,816.17 | Short term | 1,766.62 |
| | | Long term | 60,900.74 |

The respondent determined that the total payments received by petitioners Searles in each year were taxable as ordinary income.

During 1956, 1957, and 1958 the petitioners Ferguson reported on their income tax returns as gain realized on the receipt of payments of the purchase price from the Foundation the following amounts:

| Year | Total payments received | Gain reported | |
|---|---|---|---|
| 1956 | $10,458.31 | Short term | $149.90 |
| | | Long term | 7,176.46 |
| 1957 | 19,427.64 | Short term | 278.45 |
| | | Long term | 13,331.25 |
| 1958 | 12,048.67 | Short term | 172.70 |
| | | Long term | 8,267.80 |

The respondent determined that the total payments received by petitioners Ferguson in each year were taxable as ordinary income.

OPINION.

The principal issue for decision in this case is whether the transaction between Searles, Ferguson, and the Foundation constituted a bona fide sale. Respondent contends, in effect, that the instant series of events was nothing more than a sham and, therefore, must be disregarded for tax purposes.

The problem of determining the true effect of a purported sale of property to a tax-exempt corporation, or one which purports to be tax exempt, has arisen recently in several cases. *Estate of Ernest G. Howes*, 30 T.C. 909 (1958), affirmed sub nom. *Commissioner* v. *Johnson*, 267 F. 2d 382 (C.A. 1, 1959); *Emanuel N. (Manny) Kolkey*, 27 T.C. 37 (1956), affd. 254 F. 2d 51 (C.A. 7, 1958); *Union Bank* v. *United States*, 285 F. 2d 126 (Ct. Cl. 1961); *Clay B. Brown*, 37 T.C. 461 (1961), on appeal (C.A. 9, June 25, 1962). These cases have reached varying results on the issue. Since the issue is one of fact, it is apparent that precedents provide no ready answer.

After considering the evidence in this case with great care, we have reached the conclusion that the transaction involved herein was bona fide. No attempt will be made to marshal and discuss all the facts upon which this conclusion is based. Suffice it to say that we have given considerable weight to the following factors: The sale of the Anderson partnership assets was initiated because of the poor health of Searles; the Foundation was not the creation of, or in any way affiliated with, Searles; representatives of the Foundation made a thorough examination of the physical plant as well as the financial records of the partnership prior to the sale; Searles inquired into the reputation of the Foundation and its represenatives prior to the sale; the final purchase price was the result of real negotiations; Searles did not want or expect to take an active part in the management of the lessee corporation; the general manager of Anderson was not one of the sellers or related to the seller; the lessee-corporation was not inadequately capitalized; the price paid by the Foundation was not grossly excessive; there was an outright transfer by Searles and Ferguson of Anderson Dairy partnership assets to the Foundation; the right of Searles and Ferguson to recapture such assets was unavailable except in the case of a default in the payment of the purchase price and terminated upon payment of the purchase price in full; the business of Anderson was not speculative; and because of the past earnings record of the Anderson Dairy partnership it was highly probable that the Foundation would liquidate the

purchase obligation and do so within a reasonable period of time. This court is unable to conclude, as respondent would have us, that these facts constitute a sham which must be ignored for the purposes of arriving at the tax consequences of the instant exchange. Consequently, we hold that the profits received by Searles and Ferguson from the sale of their properties to the Foundation are taxable as capital gains.

The next question for consideration is whether Anderson is entitled to deduct as rent the amounts it paid to the Foundation pursuant to the terms of the lease dated May 1, 1954.

Section 162(a) of the Internal Revenue Code of 1954 [3] provides for the allowance of deductions for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including:

> (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

The respondent determined, assuming the Court found the sale from Searles and Ferguson to the Foundation to be bona fide, that the amounts claimed as deductions for rent by Anderson were unreasonable and as a result not deductible.

Since the Code does not limit deductions for rental payments to a "reasonable allowance" as in the case of salary or compensation, *Stanley Imerman*, 7 T.C. 1030, 1037 (1946), the only question to be decided is whether the amounts paid as rent were in fact and law in excess of what was required to be paid as a condition to the continued use and occupancy of the property. *Herbert Davis*, 26 T.C. 49, 56 (1956); *Roland P. Place*, 17 T.C. 199, 203 (1951), affirmed per curiam 199 F. 2d 373 (C.A. 6, 1952), certiorari denied 344 U.S. 927 (1953).

In *Herbert Davis*, *supra*, this Court stated that a taxpayer may freely rent business property on such terms as he thinks appropriate or otherwise necessary for the conduct of his business and such terms will generally be respected for tax purposes.

The evidence discloses that Anderson and the Foundation were not related parties, as that term is generally defined, that Anderson at the time of its incorporation could not have conducted a dairy business without the Foundation's assets, and that the Foundation in its negotiations with Searles and Ferguson refused to consider any lower rental figure. Furthermore, there is no evidence in the record to

---

[3] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

justify a conclusion that the amounts paid to the Foundation by Anderson were in fact or character something other than rent.

In view of the foregoing, it is held that the amounts claimed by Anderson as a deduction for rent in each of the taxable years constitute an ordinary and necessary business expense and are deductible in full under section 162 of the 1954 Code.

The final issue to be considered is whether Anderson is entitled to deduct as interest under section 163 or as an ordinary and necessary business expense under section 162 amounts paid to Searles and Ferguson during the taxable years 1956, 1957, and 1958. Anderson's explanation, in chief, for the expenditures may be stated as follows: Because of Anderson's excess capital expenditures which were chargeable against rent payable to the Foundation, a portion of the amounts payable to Searles and Ferguson on the purchase price, which was based on rentals received by the Foundation, was consequently deferred. In order to compensate Searles and Ferguson for this deferral, Anderson paid them interest on the amount of the deferral. Anderson also contends that if the amounts paid are not deductible as interest they are deductible as business expenses since they were incurred in order to obtain the consent of Searles and Ferguson for excess capital expenditures. As a final alternative, Anderson contends that the amounts paid are deductible as additional rental payments.

The respondent contends, in the alternative, that the amounts deducted do not represent interest, since the amounts were not paid on any indebtedness of Anderson and that such payments under the circumstances of this case were neither ordinary nor necessary. We agree with the respondent.

Section 163 of the Code provides that there shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness. The rule is well established that the word "indebtedness" means the obligation of the taxpayer; obligations of others do not meet the statutory requirement. *J. Simpson Dean*, 35 T.C. 1083, 1085 (1961); *Chester A. Sheppard*, 37 B.T.A. 279, 282 (1938). In the instant case, it is clear that Anderson was at no time monetarily obligated to Searles and Ferguson. Accordingly, the amounts paid to Searles and Ferguson may not be deducted under section 163.

Section 162 provides that there "shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." It is apparent from the record that if there existed any legal or moral obligation to pay Searles and Ferguson interest on the deferrals, the obligation was that of the Foundation. If the obligation to pay interest be that of

the Foundation, can Anderson's payment of such interest qualify as an ordinary and necessary business expense? In *Welch* v. *Helvering*, 290 U.S. 111 (1933), the Supreme Court responded to a somewhat similar question as follows:

Men do at times pay the debts of others without legal obligation or the lighter obligation imposed by the usages of trade or by neighborly amenities, but they do not do so ordinarily, not even though the result might be to heighten their reputation for generosity and opulence. Indeed, if language is to be read in its natural and common meaning * * *, we should have to say that payment in such circumstances, instead of being ordinary is in a high degree extraordinary. * * *

We think the Supreme Court's reasoning is equally applicable here.

The petitioners next argue that the payment by Anderson was necessary in order to obtain the consent of Searles and Ferguson for excess capital expenditures. The record does not support petitioners' argument, for the following reasons: First, the evidence reveals that during Anderson's first year of operation Searles and Ferguson gave their consent to excess capital expenditures on three separate occasions. They received no payment for their consents and there is no evidence in the record that they demanded any payment. Second, the matter of compensating Searles and Ferguson for the deferrals was first suggested by Anderson's accountant; Searles and Ferguson naturally gave their approval. Third, it was to the monetary advantage of Searles and Ferguson to give their consent to such excess capital expenditures regardless of whether they received interest on the deferrals.

Petitioners' final argument is that while it would have been more lawyerlike if the parties had amended the purchase agreement to provide for interest payments by the Foundation to the sellers on amounts of deferred payments, and similarly, if they had amended the lease to provide that the lessee would reimburse the lessor for any amounts paid to the sellers as interest, in the interest of simplicity the parties took the direct approach and had the lessee pay interest directly to the sellers. Such payments, therefore, are in tue nature of additional rentals, and, as a result, are deductible.

We believe petitioners' final argument is also without merit. "[I]f a taxpayer has two legal methods by which he may attain a desired result, the method pursued is determinative for tax purposes without regard to the fact that different tax results would have attached if the alternative procedure had been followed." *Woodruff* v. *Commissioner*, 131 F. 2d 429, 430 (C.A. 5, 1942), affirming 46 B.T.A. 727 (1942) ; see also *Wall* v. *United States*, 164 F. 2d 462 (C.A. 4, 1947). Anderson may not deduct the amounts paid to Searles and Ferguson under section 162.

*Decisions will be entered under Rule 50.*