Oscar C. Stahl and Sylvia Stahl, et al. [1] v. Commissioner. Stahl v. Commissioner
Docket Nos. 74890, 79580-79585.
United States Tax Court
T.C. Memo 1963-201; 1963 Tax Ct. Memo LEXIS 145; 22 T.C.M. (CCH) 996; T.C.M. (RIA) 63201; July 29, 1963
*145 S transferred a business in corporate form to University Hill Foundation. Foundation liquidated the corporation and leased the bulk of the assets to A, a corporation formed to operate the business, in which S and his family held a majority interest, for a period of 5 years ending February 28, 1955. A was to pay 80 percent of its profits as rent to Foundation, which was then to pass on 90 percent of those receipts to S until the original purchase price was paid in full. Lease was not renewed but A continued to hold property until it was sold in August 1956, when A settled with Foundation. A was dissolved and distributed all its assets to stockholders in complete liquidation in 1957. Held: 1. The transfer from S to Foundation in this case constituted a bona fide sale of a capital asset. 2. A's rental payments accrued during the term of the lease were made for the use of the leased property and are deductible as ordinary and necessary business expense. 3. Amounts accrued by A as rent under formula provided in lease for period A used the property after lease expired but not paid during years here involved not deductible during years under consideration. 4. Transferee liability *146 determined. George T. Altman, 233 South Beverly Drive, Beverly Hills, Calif., *147 for the petitioners. Douglas W. Argue and Paul G. Wilson, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in the individual income tax of petitioners Oscar and Sylvia Stahl (hereinafter referred to as Oscar and Sylvia) in Docket Nos. 74890 and 79580, as follows: Docket
No.
Year
Amount
74890
1954
$ 42,783.84
79580
1955
11,722.65
1956
228,535.15 These deficiencies were based primarily on the only issue remaining in these dockets, being whether the amounts reported by Oscar and Sylvia on their joint tax returns for 1954 and 1956 as installment receipts from the sale of their stock in American Extruded Products Co., are taxable as ordinary income or, to the extent of gain, as long-term capital gain. Respondent also determined a deficiency in the income and excess profits taxes of American Extruded Products Co., a corporation engaged in the manufacture and sale of plastic garden hose, as follows: Income
Taxable year ending
tax
Excess profits tax
Feb. 28, 1953
$74,100.44
$30,456.94
Feb. 28, 1954
30,041.39
871.40
July 31, 1954
69,345.78
July 31, 1955
13,158.53
July 31, 1956
15,886.81
*148 The only issue remaining in connection with this determination is whether the amounts accrued by the corporation on its tax returns for the above taxable years as rents and royalties payable to the University Hill Foundation were proper deductions. Respondent also determined that petitioners are liable as transferees of American Extruded Products Co. for the above deficiencies of the corporation to the extent set forth below: Extent of
Docket
transferee
No.
Petitioner
liability
79581
Oscar C. Stahl and Syl-
via Stahl
$233,861.29
79582
Irving Weisbart
13,050.00
79583
Richard L. Walker
600.00
79584
E. R. Schochet
11,550.00
79585
Mildred J. Spencer
1,200.00
All other issues have been agreed upon or conceded by the parties. Findings of Fact Oscar and Sylvia were, during the years 1954, 1955, and 1956, husband and wife, residing in Los Angeles, California. They filed joint income tax returns for those years with the district director of internal revenue at Los Angeles, California. American Extruded Products Co. (hereafter referred to as American) was incorporated under the laws of California on February 21, 1946, and was dissolved *149 on March 9, 1950. It began business by transfer to it, as of February 28, 1946, of an unincorporated business having book net assets of $37,122.03. The said net assets plus $77.97 in cash were transferred to it by Oscar and Sylvia for 372 shares of the corporation's stock having a par value of $37,200. The corporation thereafter, in May 1947, issued a stock dividend of 744 shares, making a total of 1,116 issued shares, all of which were owned by Oscar and Sylvia at the time of the sale herein mentioned. American's principal product, about 80 percent of its total production, was plastic garden hose. The corporation produced about 15 grades of this product. In 1949 American made a change in its manufacturing process. Under a new and secret process it used a plastisol resin for covering the core of its hose. During the years 1946, 1947, and 1948, American's products were sold primarily on the Pacific coast; the majority of its buyers being hardware firms, hardware jobbers, and department stores. In August 1949, however, it received an order in the amount of $479,520 for its garden hose from Sears, Roebuck and Co. (hereafter referred to as Sears) for distribution on a national basis. *150 Shipments on the order began in January 1950 and by the end of February 1950 approximately 40 percent of the order had been shipped and billed. In or about October 1949 American received from Montgomery Ward and Company a letter of intent to buy garden hose, also for distribution on a national basis. This letter was not a binding order but merely a letter indicating approximately how much it might buy. Prior to the end of American's fiscal year ending February 28, 1950, Oscar, who was American's president and general operating officer, anticipated approximately a 40-percent increase in American's sales for the next fiscal year. Prior to the end of February 1950 Oscar estimated American's earnings before taxes for the fiscal year ending February 28, 1951, would be approximately $200,000 to $225,000. In January or February 1950 a suggestion for a sale of American was received from R. A. Rowan and Company, real estate agents. For this purpose the Rowan firm brought Oscar together with Father Lorenzo M. Malone and Paul Cote (hereafter referred to as Malone and Cote, respectively) of the Loyola University Foundation, later known as University Hill Foundation (hereafter referred to *151 as Foundation). Cote was president of Foundation and one of its directors. Malone was a director of Foundation. Oscar first discussed the possibility of selling American with Cote and Malone at their office and then they visited American's plant and generally examined the company. In the course of their examination they looked at American's sales orders and learned of the Sears order and Montgomery Ward letter of intent. Oscar provided them with several of American's audits. American's prospective earnings were discussed and Oscar indicated his estimate to be $200,000 a year before taxes. Malone expressed the view that this was an underestimation. Oscar first asked a price of $1 million for the business, but a figure of $800,000 was ultimately agreed upon with an additional $20,000 added to cover the commission that Oscar agreed to pay the R. A. Rowan Company. The day after Oscar committed himself to a sale of American to Foundation a representative of Brandeis University, a taxexempt organization, offered to purchase American from him on the same terms offered by Foundation. An agreement (hereafter referred to as the purchase agreement) for the purchase of American by Foundation *152 was authorized by Foundation's directors and executed by the parties on February 28, 1950. Cote drafted the agreement. In the course of their negotiations Malone estimated an 8-year period for payment of the purchase price to Oscar and Sylvia under the terms of this agreement. The purchase agreement provided that as of February 28, 1950, Oscar and Sylvia had sold all the outstanding stock of American to Foundation for $820,000 (hereinafter referred to as the purchase price), $1,000 of the purchase price having been paid concurrently with the execution of the purchase agreement. The remainder purchase price was to be paid in the following manner: (a) Foundation would immediately liquidate and dissolve American and distribute all the assets to itself. Foundation would assume and pay, or agree to pay, out of the assets received all of the existing obligations of American. (b) Foundation would execute a lease, sublease, and licensing agreement to Sokol, Inc., a corporation, to operate the business formerly conducted by American and to use its fixed and operating assets and goodwill. (c) Those current assets not used by Foundation to pay American's obligations were to be sold to *153 Sokol, Inc. Payment was to be in the form of a promissory note requiring Sokol, Inc., to pay the full amount of its net income after taxes to liquidate it. Any payments on the note, after all obligations and liabilities of American assumed by Foundation had been discharged, were to be paid over to Oscar and Sylvia and applied against the purchase price. (d) The lease and sublease to Sokol, Inc., or any other subsequent lessee or sublessee, was to provide for payment to Foundation of 80 percent of the net profits derived from the operation of the lessee-company before depreciation, and before income, franchise, or other similar taxes, until $900,000 had been paid to Foundation. (e) Foundation was to pay to Oscar and Sylvia 90 percent of all rental and royalty received until the total purchase price of the stock was paid. The agreement provided that Foundation was obligated to make payment of the purchase price only out of rentals and royalties received from Sokol, Inc., or any other lessee or sublessee, or out of the proceeds of the sale of American's assets. The purchase agreement provided that Foundation would deliver, and it did in fact deliver, the following collateral to *154 Oscar and Sylvia as security for the purchase price: (1) A chattel mortgage covering any and all personal property acquired by Foundation upon liquidation of American. (2) Assignment of any note executed by Sokol, Inc., as evidence of the purchase price of current assets transferred from Foundation to Sokol, Inc. (3) Assignment of the lease and sublease from Foundation to Sokol, Inc., and any subsequent lessee or sublessee. (4) Chattel mortgage covering any and all personal property thereafter acquired by Foundation as a result of the sale transaction or the provisions of the lease or sublease to Sokol, Inc., or any other lessee or sublessee. The purchase agreement provided that in the event Foundation did not pay at least $25,000 of the purchase price in any annual accounting period Oscar and Sylvia could, at their option, declare the remaining balance of the purchase price due and payable. The agreement further provided that if Foundation should default on any of its obligations under the agreement that Oscar and Sylvia could declare the balance of the purchase price due and payable and, if not paid, they could enforce payment under the collateral held as security, but *155 out of this collateral only. Oscar and Sylvia warranted in the purchase agreement that the balance sheet below correctly reflected the financial condition and net worth of American as of February 28, 1950: ASSETS
Current assets: Cash in bank
$ 19,708.66
Petty cash
50.00
Accounts Receivable - trade
$149,822.04
Less: Reserve for doubtful accounts
9,757.02
140,065.02
Note receivable - sale of equipment
1,300.00
Accounts payable - debit balances
530.95
Advances to officers
4,864.89
Due from employee
100.00
Drum Deposit
126.00
Merchandise inventory
180,191.61
Total current assets
$346,937.13
Fixed assets: Furniture and fixtures
$ 7,683.73
Less: Reserve for depreciation
1,812.34
$ 5,871.39
Trucks and autos
$ 8,669.63
Less: Reserve for depreciation
5,525.54
3,144.09
Machinery and equipment
$124,063.47
Less: Reserve for depreciation
15,565.39
108,498.08
Leasehold Improvements
$ 39,700.13
Less: Reserve for amortization
18,731.35
20,968.78
Net fixed assets
138,482.34
Deferred charges and other assets: Unexpired insurance
$ 3,535.92
Deposit - State Board of Equalization
25.00
Prepaid taxes
1,231.72
Organization expense
247.77
Trademarks
65.00
Total deferred charges and other
5,105.41
assets
Total assets
$490,524.88
LIABILITIES AND CAPITAL
Current liabilities: Accounts payable - trade
$142,587.76
Note payable - stockholder
25,000.00
Accounts receivable - credit balances
1,204.41
and deposits
Accrued wages and expenses payable
5,547.21
Sales taxes payable
1,250.27
Employees' income taxes withheld
2,056.90
Social Security taxes payable
1,901.29
Federal income tax payable - 1949-1950
8,820.26
California franchise tax payable -
1,231.72
1950-1951
Total current liabilities
$189,599.82
Notes payable bank (monthly
110,000.0
installments of $5,000 per month)
Capital stock - common, par value $100
Authorized - 10,000 shares
$1,000,000.00
Unissued - 8,884 shares
888,400.00
Capital stock issued and outstanding -
111,600.00
1,116
Surplus: Surplus, Feb. 28, 1949
$ 57,352.38
Net profit for the period Mar. 1,
30,792.94
1949, to Feb. 28, 1950
$ 88,145.32
Less: Provision for income taxes
8,820.26
Surplus, Feb. 28, 1950
79,325.06
Total liabilities and capital
$490,524.88
*156 This balance sheet, except for minor variations, corresponds with American's end of the taxable year balance sheet as shown on its income tax return for the fiscal year ending February 28, 1950. American's earned surplus and undivided profits on the latter balance sheet was $79,325.06, the same amount listed as surplus on the balance sheet accompanying the purchase agreement. Except for goodwill and other intangibles the value of the net assets of American as of February 28, 1950, was as follows: Machinery and equipment
$124,000.00
Furniture and fixtures
8,219.95
Automobiles and trucks
4,401.73
Current assets, less all liabilities
73,098.73
Total
$209,720.41
Oscar did not investigate Foundation's financial condition before entering into the purchase agreement but was aware of the fact that Foundation had purchased other businesses under similar arrangements and was not worried about his security because of the terms of the agreement. Oscar was assured by Cote and Malone that the transaction would be accepted as a bona fide sale by the Internal Revenue Service. On February 28, 1950, at a special meeting of the board of directors of American, Oscar, Sylvia, *157 and Dorothea Groves (hereafter referred to as Groves) resigned as president, vice president, and secretary-treasurer, respectively, and as directors of American. At the same meeting Malone, Cote, and A. W. Davis were installed as president, vice president, and secretary-treasurer, respectively, and as directors of American. On February 28, 1950, the new board of directors of American adopted a resolution to wind up the affairs of and dissolve the corporation, and to distribute the assets remaining after payment of outstanding obligations to the stockholders thereof as a liquidating dividend. On February 28, 1950, the new directors and officers of American executed a certificate of complete dissolution attesting to the liquidation of American and also executted an agreement assuming on behalf of Foundation all liability of the corporation for California franchise taxes. Under date of November 1, 1946, the Stahls, as lessors, and American, as lessee, entered into a lease of the premises at 1023 N. LaBrea Avenue, Hollywood, California, for a period of 5 years at a rental of $750 per month for the first 5 months, $1,000 a month for the next 8 months, and $1,500 a month for the remainder *158 of the lease. American conducted its business on these premises. Under date of February 28, 1950, the November 1, 1946 lease was canceled. Under date of March 1, 1950, the Stahls entered into a new lease of the premises with Foundation for a period of 5 years for a total rental of $90,000, payable in monthly installments of $1,500 each. Sokol, Inc. (hereafter referred to as the operating company), was incorporated under the laws of California on February 27, 1950. On March 1, 1950, its name was changed from Sokol, Inc., to American Extruded Products Co. Its name was changed back to Sokol, Inc., on October 22, 1956. The total sum invested in stock of the operating company was $10,000, divided into 1,000 shares of $10 each. The stock was issued November 8, 1950, as follows: Number of
Issued to
shares
Mildred J. Spencer
40
Richard L. Walker
20
Louis A. Rinds
50 [1]
Dan Sokol
385 [2]
Oscar Stahl
200 [3]
Sylvia Stahl
185 [4]
Rose Thush
120
*159 The shares issued to Mildred J. Spencer and Richard L. Walker were purchased for them by Malone. Louis Rinds was a friend of Oscar's and Dan Sokol's (hereafter referred to as Sokol). Rose Thush was Sylvia's mother. Sokol had been a salesman and sales manager of American and became president of the operating company. He purchased his shares at his own request and with his own money. Either Malone or Cote suggested that Sokol be elected president of the operating company. Foundation did not object to any of the above individuals being stockholders, as it had a right to do under the purchase agreement with the Stahls. The original directors of the operating company were Sokol, Benjamin J. Goodman, and Shirley Nakell. On February 28, 1950, Shirley Nakell resigned and was replaced by Groves, who had formerly been secretary-treasurer of American. On December 17, 1951, Benjamin Goodman resigned and was replaced by Ben Levin, attorney for the operating company and Oscar. Sokol continued as a director and president of the operating company until December 28, 1956. On March 1, 1950, a lease and license agreement was entered into between Foundation, as lessor, and the operating company, *160 as lessee, under which Foundation leased and subleased to the operating company the operating assets, goodwill, trade names, and trademarks of American, and the premises at 1023 N. LaBrea Avenue. The term of the lease was 5 years and the rent and royalty was to be 80 percent of the net profits resulting from the operation of the business until a total of $900,000 was paid, after which the percentage was to be 60 percent. Under the lease the operating company was also obligated to pay as part of its operating expenses the rental for the premises at 1023 N. LaBrea Avenue. In the event the operating company paid rental of less than $25,000 in any full annual accounting period Foundation had the option of declaring the term of the lease ended. The operating company was to maintain the premises in good state of repair, subject only to normal wear and tear, and replace any automotive equipment or other expendable personal property. Any repairs, improvements, and replacements were to become the property of Foundation. The operating company alone was to bear any losses incurred in the operation of the business and Foundation was at no time to be called upon to expend any amount for maintenance *161 and repair of the rented premises and personal property. On March 1, 1950, the operating company executed a noninterest-bearing demand note in favor of Foundation in the amount of $73,098.73 in payment for the current assets less current liabilities of American, which figure represented the difference between the total debits ($399,451.56) and the total credits ($326,352.83) of the operating company on March 1, 1950, as reflected in the books of that company. On the same date this note was assigned by Foundation to the Stahls as partial security for the purchase price of American. Under date of March 1, 1950, the Stahls agreed to pay the R. A. Rowan Company a commission of $20,000 for the part which the latter company had played in arranging the transaction between them and Foundation. The commission was to be paid solely from the payments made by Foundation on the purchase price, and not from any other source. The operating company's business was for all intents and purposes a continuation of the business carried on by American. The management employees of the operating company at its inception were the same as those employed by American when it was liquidated. It was contemplated *162 by the parties to the purchase agreement that Oscar would act as manager of the operating company and he did so - he was given the title "general manager" - receiving the same salary he had received from American. His new position, except as to the title, did not vary greatly from the position he held with American. Sometime in 1950 Oscar requested a loan for the operating company from the Bank of America. As a prerequisite to the loan the bank required a subordination agreement from Foundation as to any existing or thereafter existing claims of indebtedness it had against the operating company as well as a guarantee of the loan from both Foundation and Oscar. The requirements were complied with by Foundation and Oscar and Sylvia, but this caused Oscar to become somewhat disenchanted with the transaction he had entered into with Foundation because he had been led to believe that Foundation would supply the necessary working capital for the operating company. The nature of the garden hose business was such that the product was sold starting in September of one year for delivery starting in January and payment in April, May, and June of the following year. As sales of hose increased *163 the business needed more money to carry it from the time it started selling and manufacturing its product until the time it received payment. The operating company was never able to make its rental payments to Foundation at the times provided in the lease and one of the reasons for this was its lack of sufficient working capital. During the period of the operating company's lease with Foundation, Malone visited the operating company at least twice a month, at which times he moved freely throughout the premises, attended staff meetings, and discussed the business with the operating personnel. He also met most of the operating company's major suppliers to whom Oscar introduced him as a representative of the organization which had bought American. Romeo P. Allard (hereafter referred to as Allard), who at all times material was a professor of chemistry and chairman of the chemistry department at Loyola University, was director of research for the operating company during the years 1953 to 1956. Allard became associated with the operating company at the request of Malone at a time when the operating company was having difficulty with the formulation of the mixture with which it covered *164 its hose. Allard solved the difficulty a short time after he joined the operating company and then remained on as its director of research. He performed most of his work at the operating company's plant and spent approximately 10 to 20 hours a week doing so. In August 1950 the operating company received another order for hose from Sears in the amount of $465,000. After placing this order Sears requested that in the future the operating company sell its hose for them on a "known-cost basis." Oscar did not accede to this request because he believed it would result in the operating company losing money on the account. Sears purchased no more hose from the operating company. Montgomery Ward continued to purchase hose from the operating company until it ceased business in 1956. Under date of February 6, 1953, Oscar wrote to Foundation, stating that it was his intention, due to ill health, to sell his and Sylvia's interest in the purchase agreement. He further stated that it was his understanding of a previous discussion of the matter that in the event he should sell his interest in the contract by March 1, 1954, that Foundation would sell to the purchaser all its right, title, and interest *165 to the property received upon the liquidation of American for $50,000, less 10 percent of any payments received by Foundation from the operating company during the period January 1, 1953, to March 1, 1954. Under date of February 10, 1953, Cote wrote to Stahl on behalf of Foundation acknowledging their previous discussion of the matter and saying that it would not be possible to say what Foundation would accept in the event a buyer wanted the interest of everyone to the purchase agreement until he knew what the proposed deal was. He stated that Foundation was willing to work out a fair and equitable deal when a firm proposal was submitted. He acknowledged discussion of a $50,000 figure for Foundation's equity, but stated that there had been no discussion with respect to reducing the amount by the rental from the operating company retained by Foundation. Under date of December 15, 1950, Foundation wrote to the operating company referring to the latter's obligation under their lease to render a quarter-annual accounting and to Foundation's unsuccessful efforts to obtain such an accounting and payment of rental fees to date; and requesting that the operating company give the matter immediate *166 attention. Under date of February 15, 1951, Foundation wrote to the operating company stating that unless it received an immediate reply to its letter of December 15, 1950, it would be forced to take such steps it might deem necessary to protect and enforce its rights under the lease. Under date of April 16, 1951, Foundation wrote to the operating company acknowledging receipt of the latter's accounting for the period March 1, 1950, to February 28, 1951, disclosing its rental liability and acknowledging numerous conferences regarding payment of the rent at which the operating company indicated its temporary lack of cash and that all the profits of the business were tied up in inventory. The letter continued, stating that nevertheless Foundation insisted on a substantial payment on its rental liability account without further delay. In a letter to Cote dated January 29, 1953, the operating company stated that it was its understanding that it was to own all assets purchased since March 1, 1952, with a limit not to exceed its surplus and that it was its intention to set up $32,860.99 in fixed assets which originally had been charged against the rent account. It further stated that this *167 amount was far below its present surplus figure. In a letter dated January 30, 1953, Foundation acknowledged this letter and stated that it had no objection to the operating company acquiring $32,860.99 of fixed assets. In a letter to the operating company dated November 11, 1954, Foundation called attention to the fact that the operating company's lease expired on February 28, 1955, and stated that it was unwilling and unable to grant any extension or renewal of the lease and, accordingly, would require delivery of possession of all leased assets concurrent with the expiration of the lease. In a letter to the operating company under date of January 10, 1955, Foundation (1) reconfirmed the statements it made in its letter of November 11, 1954; (2) called attention to the fact it could no longer use the name "American Extruded Products" after the termination of the lease; (3) stated that according to its records the operating company was indebted to it under a promissory note in the amount of approximately $317,000, which note would accrue and become due on February 28, 1955; (4) stated that concurrent with the expiration of the lease it would require payment in full for all rent *168 that accrued to that date. The operating company did not give up possession of Foundation's assets at the expiration of the lease, but continued to use and possess those assets through August 1956. It continued to accrue rents and royalties payable to Foundation on its books and tax returns for its taxable years ending July 31, 1955 and 1956, on the basis of the formula called for in the lease. In a letter to the operating company dated April 4, 1955, Foundation (1) acknowledged that since its last letter concerning the termination of the lease the operating company had indicated its willingness but inability to comply with Foundation's demands; (2) called attention to the fact that the operating company was holding Foundation's assets contrary to the lease terms and to the latter's demands for possession; (3) stated it would not renew or extend the lease and that it considered the operating company a trespasser and would hold it liable for damages; (4) acknowledged that the operating company had proposed that after it had effected a complete liquidation of its business it would sit down and adjust its differences and disputes with Foundation; (5) assured the operating company *169 it did not desire to engage in litigation but stated that any verbal courtesies it extended to the operating company could not be deemed or considered as a variance from its legal positions and demands. At a special meeting of the operating company's board of directors on August 13, 1956, a resolution was adopted calling for the liquidation of the operating company and the sale of its assets to Resin Industries (hereinafter referred to as Resin), a competitor of the operating company, and authorizing the operating company's officers to consummate the sale. The minutes of this meeting state that prior to the adoption of this resolution there was discussion with respect to Foundation's ownership of a great portion of the machinery and equipment used by the operating company in the conduct of its business, to Foundation's refusal to extend or renew its lease of this machinery and equipment which expired February 28, 1955, to the operating company's lack of resources to purchase machinery and equipment of its own, and to the operating company's inability to find during the previous year and one-half a purchaser for its assets on as advantageous a basis as that in the proposed agreement *170 with Resin. At a regular meeting of Foundation's board of directors on August 27, 1956, it was resolved that Foundation accept the recommendations of its chairman for the settlement of all its claims against the operating company for $348,092.64 cash - $273,092.64 in unpaid rent and $75,000 as damages for wrongful withholding of assets from March 1, 1955, to date - and for the sale of all assets leased to the operating company to Resin for $70,000 cash; and for settlement in full of its indebtedness to the Stahls for $379,783.38. The proper officers of Foundation were also authorized and instructed to consummate these transactions. The minutes state that during the discussion leading to these resolutions the chairman pointed out that the plastic hose business had "become so competitive and profits so short, that it was not reasonable to expect the tenant to pay any substantial rental for the use" of Foundation's assets in the future. Escrow instructions under date of August 21, 1956, were thereafter signed by Foundation and the operating company, as sellers, and Resin, as buyer, for the sale of "certain stock in trade, fixtures, equipment of a certain business known as American *171 Extruded Products Co." for $85,000, attributable to machinery and equipment, plus the value of raw material and finished goods of the business. The escrow instructions provided that the following documents, inter alia, would be deposited in escrow by seller: (1) Inventory of machinery and equipment. (2) Assignments of trade names Amepco, Realite, and Duro-Tred. (3) A lease of the premises at 1023 N. LaBrea, Los Angeles, which were owned by Oscar and Sylvia and used pursuant to lease by the operating company as a place of business, from owner to buyer on month-to-month tenancy at $1,500 a month. The escrow instructions provided that $10,000 of the purchase price was to be paid concurrently with the signing of the instructions, the remainder to be paid at the close of escrow. Under date of August 30, 1956, Foundation and the operating company executed an agreement whereby the latter agreed to pay the former the $273,092.64 in accrued rent due under the lease of March 1, 1950, plus $75,000 as damages for retention of the leased assets after termination of the lease. Their agreement provided that $70,000 of the $85,000 payable for machinery and equipment under their escrow with *172 Resin was attributable to machinery and equipment of Foundation and the remaining $15,000 to that of the operating company. Both parties agreed to instruct the escrow holder to pay Foundation all proceeds of the escrow not exceeding $418,092.64 (computed $273,092.64, rent; $75,000, damages for use; $70,000, machinery and equipment), any excess being paid to the operating company and any deficiency being paid by the operating company to Foundation upon close of escrow. Finally, their agreement provided that upon the receipt of the $418,092.64 Foundation released the operating company from all liability under the lease and for the unauthorized use of the leased assets after the termination of that lease. In a written agreement dated August 30, 1956, the Stahls agreed to accept $379,783.38, said moneys to be paid only out of moneys received by Foundation from the escrow with Resin or from the operating company pursuant to the agreement referred to above, in full settlement of all claims they had against Foundation by reason of the purchase agreement of February 28, 1950, and the security agreements executed in connection therewith. The escrow was closed on or about September 12, 1956. Resin *173 paid into escrow a total of $355,935.16 - $10,000 on August 21, 1956, and $345,935.16 on or about September 12, 1956 - which the additional escrow instructions filed by the parties thereto on September 7, 1956, allocated as follows: Cost of raw, in process, and finished
goods
$244,783.86
Cost of miscellaneous items
13,100.00
Balance of purchase price
85,000.00
State Board of Equalization
3,400.00
Proration of personal property taxes
9,339.80
Chattel search
35.00
L. A. Daily Journal
5.50
Recording chattel mortgage
1.00
Escrow fee
270.00
Drawing notice of sale
1.00
Total
$355,935.16 Under date of September 12, 1956, the escrow agent forwarded to Foundation, in the form of a check, the seller's proceeds of the escrow totaling $351,746.96. By check dated September 14, 1956, the operating company paid Foundation $66,345.68. In May 1957 the operating company distributed its remaining assets in liquidation to its shareholders, prorata to their shareholdings, as follows: Number of
shares
Shareholder
held
Amount
Mildred J. Spencer
40
$ 1,200.00
Richard J. Walker
20
600.00
Rose Thush
120
3,600.00
Irving Weisbart
435
13,050.00
E. R. Schochet
385
11,550.00
*174 The following schedule sets forth the sales, net profit before accrual of rents and royalty of Foundation, net profit before taxes, and net profit after taxes of American and the operating company during the period March 1, 1946, to July 31, 1956: Net profit
be-
fore acerual
to Foun-
Net before
Net after
Sales
dation
taxes
taxes
Before February 28, 1950 - American
3/1/46-2/28/47
$ 935,169.15
$142,117.36
Same
$88,112.76
3/1/47-2/29/48
954,872.24
30,321.85
Same
21,756.28
3/1/48-2/28/49
822,831.15
30,450.24
Same
21,888.34
3/1/49-2/28/50
1,232,477.41
30,792.94
Same
21,972.68
After February 28, 1950 - The operating company
2/28/51
2,163,520.32
287,773.11
$55,717.37
33,576.59
2/28/52
1,510,198.57
80,662.86
16,132.56
11,184.73
2/28/53
1,859.516.27
198,653.99
39,730.79
24,444.64
2/28/54
2,370,409.42
95,828.29
19,165.66
13,415.96
7/31/54
1,043,515.27
171,663.03
34,332.61
18,776.32
Short period
1,717,720.00 [1]
282,573.00 [1]
56,514.60 [1]
32,27.01 [1]
annualized
7/31/55
1,701,218.03
59,628.84
11,565.77
8,096.04
7/31/56
1,777,788.13
65,214.16
13,042.83
9,129.98
*175 The operating company's business operations during the period August 1, 1954, to February 28, 1955, resulted in a net loss of $4,749.30. [2]
The rents and royalties accrued to and paid to Foundation by the operating company during the period of its existence as shown on the latter's books and records were as follows: [3]
Total ac-
Paid by
Paid by cash
Balance at
purchase
close
Accounting period
crued
of
Date
Amount
of period
equipment
3/1/50-2/28/51
$232,055.74
$19,043.71
$213,012.03
3/1/51-2/29/52
64,530.30
5,979.63
5/ 8/51
$ 50,000.00
221,562.70
3/1/52-2/28/53
158,923.20
(176.39)
3/ 1/52
100,000.00
2/ 2/53
121,562.70
159,099.59
3/1/53-2/28/54
76,662.63
235,762.22
3/1/54-7/31/54
137,330.42
373,092.64
8/1/54-7/31/55
48,063.07
8/12/54
100,000.00
321,155.71
8/1/55-7/31/56
52,171.33
373,327.04
9/14/56
66,345.68
306,981.36
11/ 7/56
306,981.36
The $306,981.36 payment, dated November 7, 1956, was noted in the operating company's books and records as having been paid to Foundation out of the proceeds *176 of escrow on sale of assets to Resin Industries. The books and records of Foundation show receipts and disbursements in connection with its transactions with the Stahls and the operating company, as follows: [4]
Received by
Retained by
Paid to or on
Founda-
Founda-
behalf of
Date
Description
tion
tion
Stahls
5/ 1/50
Checks to Stahl or R. A.
Rowan Co. by
Foundation
$ 1,000.00
10/17/50
"Payment by operating
company relative
to intangibles"
$ 8,063.65
10/17/50
Payment by check to Stahl
8,063.65
5/ 8/51
Payment of rent by
50,000.00
$ 5,000.00
operating company
5/ 9/51
Checks to Stahl and R. A.
45,000.00
Rowan Co.
2/28/52
Payment of rent by
100,000.00
10,000.00
operating company
3/10/52
Check to Stahl
90,000.00
2/ 2/53
Payment of rent by
121,562.70
12,156.27
operating company
2/ 4/53
Check to Stahl
109,406.43
8/24/53
Payment by operating
company of
$73,098.73 note, plus
$741.29 from sale
of assets
73,840.02
8/27/53
Check to Stahl
73,840.02
8/12/54
Payment of rent by
100,000.00
10,000.00
operating company
8/12/54
Check to Stahl
90,000.00
9/14/56
Payment of rent by
operating company
by check
66,345.68
38,309.26
9/14/56
Proceeds from escrow on
306,981.36
sale to Resin
9/14/56
Payment to Stahls
379,783.38
Total
$871,559.01
$75,465.53
$797,093.48
*177 Foundation was incorporated under the laws of California in 1945 as a nonprofit corporation. The purposes for which it was formed as set forth in its articles of incorporation are, inter alia: To engage in, support and carry on research and experimental work of all kinds relating to education, science, human welfare, health, sanitation and the prevention and cure of disease, to maintain and operate laboratories and therein and otherwise to conduct and support research and experimental work relating to the aforesaid purposes or any of them; to contribute funds to other organizations or other persons to enable them to carry on similar activities; * * * During the period 1945 to the time of trial Foundation entered into transactions, similar to the one it entered into with the Stahls, with approximately 15 to 20 other companies, their owners or stockholders. At the time of the trial of this proceeding most of these businesses had been paid for in full and were still owned by Foundation. Foundation's purpose for entering into these transactions was to permanently acquire these businesses as a source of long-term income for Loyola University. The general pattern *178 that Foundation followed in acquiring these businesses was the one followed in this case. Foundation was granted tax-exempt status in 1946 as an educational and charitable organization. In 1956 its tax-exempt status was revoked by the Treasury Department retroactively to and including its fiscal year ending April 30, 1952. Oscar and Sylvia determined the gain on the sale of their American stock by subtracting from the purchase price called for in the purchase agreement of $820,000 their $37,200 basis in the stock plus their basis of $4,418.75 in stock in the Atlas Plastic Corporation which their joint income tax returns for 1954, 1955, and 1956 noted as having been sold to Foundation at the same time the American stock was. Using the installment basis they reported on their joint returns for 1954 and 1956 long-term capital gain from the sale in the amounts of $85,432.08 and $364,928.74, [5] respectively. In his notice of deficiency to Oscar and Sylvia for the years 1954 and 1956, respondent determined that the total amounts received by Oscar and Sylvia from Foundation in those years constituted ordinary income from the continuance of a business. *179 The operating company filed its tax returns for the taxable years ending February 28, 1953 and 1954, and July 31, 1954, 1955, and 1956, on the accrual basis. It deducted for those years the amounts of $158,923.20, $76,662.63, $137,330.42, $48,063.07, and $52,171.33, respectively, as rents and royalties due Foundation under their lease of March 1, 1950. In the notices of deficiency to the petitioners in Docket Nos. 79581-79585, respondent determined that these amounts were not deductible by the operating company because of lack of substantiation that they constituted a proper deduction under the provisions of the Internal Revenue Codes of 1939 and 1954. Respondent determined that the following amounts were deductible for these taxable years as representing "an allowance of an amount actually attributable to the use of property": Taxable year ending
Amount
-
Feb. 28, 1953
$16,422.35
Feb. 28, 1954
16,422.35
July 31, 1954
6,850.98
July 31, 1955
16,075.53
July 31, 1956
15,562.00 As a result of this and other adjustments he determined a total deficiency in the operating company's income tax and excess profits tax for these years of $233,861.29. Respondent determined *180 that petitioners in Docket Nos. 79581-79585 were liable for these deficiencies as transferees of the operating company's assets in the following amounts plus interest: Docket No.
Amount
79581
$233,861.29
79582
13,050.00
79583
600.00
79584
11,550.00
79585
1,200.00
Opinion The first issue for decision is whether the $90,000 and $379,783.38 payments received by the Stahls in 1954 and 1956, respectively, constituted proceeds from the sale of capital assets as reported by the Stahls on their joint income tax returns for those years. Respondent contends the transaction that gave rise to these payments, although in form a sale, was not in substance a sale of capital assets, but in reality a tax avoidance device by which the Stahls sought to convert future profits of a business operation into long-term capital gains. The question of what tax treatment should be accorded payments arising from the purported sale of a going business to a tax-exempt organization in which the tax-exempt organization obligates itself to pay the purchase price only out of rentals received *181 upon the lease of the businesses' assets to a new corporation in which the purported sellers have an interest, and/or from the sale of the businesses' assets, has arisen in a number of recent cases. Clay B. Brown, 37 T.C. 461 (1961), on appeal (C.A. 9, June 25, 1962); Anderson Dairy, Inc., 39 T.C. 1027 (1963); Royal Farms Dairy Co.40 T.C. 172 (1963); Union Bank v. United States, 285 F. 2d 126 (Ct. Cl. 1961). [6] These cases have established that characterization of such transactions, if bona fide, as sales is in accord with substantial economic reality and that they shall be treated as such for purposes of the capital gains provisions of the Internal Revenue Codes of 1939 and 1954. Clay B. Brown, supra; Anderson Dairy, Inc., supra; Royal Farms Dairy Co., supra; Union Bank v. United States, supra; cf. Estate of Ernest G. Howes, 30 T.C. 909 (1958), affirmed sub nom. Commissioner v. Johnson, 267 F. 2d 382 (C.A. 1, 1959). Whether the purported sale here was bona fide is a question of fact. Anderson Dairy, Inc., supra.We are satisfied that it *182 was. Pursuant to the purchase agreement of February 28, 1950, the Stahls irrevocably transferred all their equitable interest in American's business and assets to Foundation and became oreditors, with mortgages and other security devices as collateral, of Foundation for the purchase price. Thereafter they had no right of reversion to American's assets unless Foundation failed to comply with the provisions of the purchase agreement or unless Foundation failed to pay $25,000 a year toward the purchase price. Upon full payment of the purchase price the Stahls' security interest was to terminate and they were to have no further interest in American's assets or business. The two individuals who represented Foundation throughout its transaction with the Stahls were deceased at the time of the trial of these proceedings. We are satisfied, however, from the testimony of one of Foundation's directors at the time the purchase agreement was executed concerning Foundation's purpose and policy with regard to *183 the numerous transactions of this nature that it entered into, and the Foundation's conduct throughout the transaction here, that its principal object was the permanent acquisition of American's assets and business as a source of long-term income for Loyola University. Foundation was not a creation of the Stahls nor were they related to it in any way. The Stahls' economic interests under the transaction were basically inconsistent with those of Foundation. By reason of its tax-exempt status and the mechanics of the transaction Foundation was able to agree to, and pay in a shorter period of time, a higher purchase price than someone else who did not enjoy that privilege could, but it was to its financial best interest to keep the purchase price to the minimum. The Stahls' best interests dictated they seek the highest purchase price they could obtain. At the time the purchase agreement of February 28, 1950, was entered into, both Oscar and Malone, one of Foundation's principal representatives throughout its transaction with the Stahls, were of the opinion that American's new accounts with. Sears and Montgomery Ward would result in the business' net profit before tax increasing to approximately *184 $200,000 in the fiscal year ending February 28, 1951. Malone was of the opinion that this was an understimation. Net profits before tax actually reached $287,773.11 for that period and although erratic thereafter, sometimes approximating that figure and sometimes faillng well below it, the business' sales and net profit before tax subsequent to the purported sale were always considerably greater than in the 3 years preceding it, thus justifying Oscar's and Malone's optimism at that time. Net profits before tax of $200,000 a year would have resulted in Foundation receiving more than sufficient rentals to meet the minimum $25,000-a-year payment toward the purchase price and would have resulted in its being able to pay the full purchase price in a reasonable period of time. Under the circumstances we do not think the $820,000 purchase price was so unreasonable as to prove or even indicate that the agreement was other than what it purported to be and that the amounts received by the Stahls were other than the purchase price of their stock in American. Although we have given little weight to it in determining whether the transaction here was bona fide, we think there is some significance *185 to the fact that Oscar was offered the same transaction on the same terms by another tax-exempt organization just after he committed himself to the transaction here. During the course of the trial of these proceedings the parties introduced considerable documentary and testimonial evidence regarding the transaction in question. We feel an extended discussion of all the evidence in the light of the argument made by the parties would serve no useful purpose. Suffice it to say that we have considered the evidence here presented in the light of the factors discussed in the cases cited above and we perceive no differences in the transaction here involved and those involved in the cited cases which are so substantial or material as to require, or in fact to justify, a different conclusion here from the conclusions reached in those cases. The fact that the Stahls, together with Sylvia's mother, owned slightly over 50 percent of the stock of the operating company, whereas in the other cases the owners of the original corporation were limited to 48 percent of the stock of the new operating company, does not have too much significance in the light of the fact that the operating company became *186 the owner of only a few of the assets of the business. The issue is one of fact and it is our conclusion on the record as a whole that the purchase agreement of February 28, 1950, was at arm's length, and that the intention of the parties thereto was that the Stahls sell and Foundation purchase all the former's interest in American. In view of the above finding it is our conclusion that the $90,000 and $379,783.38 payments received by the Stahls in 1954 and 1956, respectively, pursuant to the agreement were proceeds from the sale of capital assets held for more than 6 months. Clay B. Brown, supra; Anderson Dairy, Inc., supra; Royal Farms Dairy Co., supra; Union Bank v. United States, supra. Respondent's reliance here on Emanuel N. (Manny) Kolkey, 27 T.C. 37 (1956), affd. 254 F. 2d 51 (C.A. 7, 1958), is misplaced as it was in the Clay Brown and Royal Farms Dairy cases. The operating company, which filed its tax returns on the accrual basis, accrued on its books and deducted on its tax returns for the taxable years and periods ending February 28, 1953 and 1954, and July 31, 1954, 1955, and 1956, 80 percent of *187 its net profits before tax for those periods as rents and royalties payable to Foundation. Respondent has disallowed the amounts so deducted in each year or period and has determined that Oscar, Sylvia, Weisbart, Spencer, Schochet, and Walker, are liable as transferees of the operating company for the deficiencies in its income and excess profits taxes which he has determined as a result of these and other adjustments he made in its tax returns for those years. Each of the alleged tranferees contests both his or her liability as a transferee of the operating company and the respondent's disallowance of the rental and royalty deductions, Respondent's allegation of transferee liability against Oscar and Sylvia is grounded on his contention that the purchase agreement of February 28, 1950, between the Stahls and Foundation was not a bona fide sale and that the amount the Stahls received from Foundation was an indirect distribution of assets of the operating company which resulted in its insolvency. We have found as a fact that the sale was bona fide; therefore, respondent's determination of transferee liability against the Stahls must fail for lack of a foundation as well as lack of *188 any proof of insolvency on the part of the operating company at the time of its settlement with Foundation and Foundation's settlement with the Stahls. Respondent's disallowance of the deduction for rents and royalties, resulting in a claim against the corporation for unpaid taxes which it did not have assets to pay, forms the basis of respondent's determination of transferee liability against petitioners Spencer, Walker, Weisbart, and Schochet (hereafter referred to as petitioners) to the extent of the amounts they received as stockholders upon liquidation of the operating company. We first consider whether the amounts claimed by the operating company on its tax returns for its fiscal years here involved are deductible as rents and royalties. The Internal Revenue Codes of 1939 and 1954 [7] allow as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business, including rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which *189 the taxpayer has not taken title. The deduction for rent is not limited to a "reasonable allowance" as in the case of compensation or salary, sec. 23(a), I.R.C. 1939; sec. 162(a), I.R.C. 1954; Stanley Imerman, 7 T.C. 1030 (1946); Anderson Dairy, Inc., supra; but rather the deduction turns on whether the amount paid or incurred was in law and fact required to be paid as a condition to the continued use and possession of the property. Stanley Imerman, supra; Anderson Dairy, Inc., supra.The evidence indicates that Foundation and the operating company were not related in the usual sense of the word, see Anderson Dairy, Inc., supra; that Foundation owned assets without which the operating company could not have embarked on the hose-extruding business; that, pursuant to a written lease, the operating company acquired the use and possession of those assets for 5 years, commencing March 1, 1950; that the lease required the operating company to pay 80 percent of its net profits before tax to Foundation for that right; and that the operating company did, in fact, pay Foundation 80 percent of the net *190 profits before tax it earned during the period of the lease. We think these facts contstitute a prima facie showing that the amounts which the operating company accrued on its books and deducted on its tax returns pursuant to the terms of its lease with Foundation were required as a condition to the continued use of the property during the term of the lease. Stanley Imerman, supra; Anderson Dairy, Inc., supra; Sprague Electric Co., 36 T.C. 1043, 1083 (1961), on appeal (C.A. 1, Feb. 21, 1963).
We do not have the evidence in this case that enabled us to conclude in Royal Farms Dairy Co., supra, that despite the terms of the lease, the payments were not required to be made as a condition to the continued use and occupancy of the property. We have no expert testimony concerning reasonable rental - nor did respondent make any explanation of how *191 he arrived at the amounts he allowed as rental in the notice of deficiency. Nor has respondent introduced any evidence which convinces us that the amounts called for in the lease were not required or that they were paid for something other than the use of property. We therefore hold that the amounts so accrued during the term of the lease were proper deductions under section 23(a)(1), I.R.C. 1939. [8]
The burden of proving the operating company's right to deduct the amounts accrued on its books as rents and royalties subsequent to the expiration of the lease was on petitioners. Sec. 6902, I.R.C. 1954; Standard Oil Co., 43 B.T.A. 973 (1941), affd. 129 F. 2d 363 (C.A. 7, 1942), certiorari denied 317 U.S. 688 (1943), rehearing denied 319 U.S. 784 (1943); Bard-Parker Co., 18 T.C. 1255 (1952), affd. 218 F. 2d 52 (C.A. 2, 1954), certiorari denied 349 U.S. 906 (1955). *192 The operating company's lease of Foundation's assets expired on February 28, 1955. It continued, however, to accrue 80 percent of its net profits before tax on its books and tax returns as rents and royalties payable to Foundation through its taxable year ending July 31, 1956. The circumstances surrounding the accruals subsequent to February 28, 1955, are not clear. What evidence we do have indicates that as far as Foundation was concerned no lease, either express or implied, existed between the two parties after that date. Furthermore, in their settlement agreement entered into in August 1956, the parties designated a part of the amount paid by the operating company to Foundation as damages for retention of the leased assets beyond the term of the lease. Under these circumstances a finding that the amounts so accrued after February 28, 1955, were required as a condition to the continued use and possession of property is not possible. We hold, therefore, that the amounts which the operating company accrued after February 28, 1955, as rents and royalties payable to Foundation were not proper deductions under section 162(a)(3), I.R.C. 1954. Nor do we think *193 the record in this case supports a finding that the amounts so accrued for the period beyond termination of the lease were deductible by the operating company in the years here involved as damages paid for the use of property in a trade or business, as contended by petitioners on brief. A deduction of damages by an accrual base taxpayer in a taxable period prior to the one in which they are actually paid requires that there be a recognized and fixed obligation to pay the amounts so accrued in the prior year. Lucas v. American Code Co., 280 U.S. 445 (1930); Sunset Color Works, 21 B.T.A. 304 (1930). The evidence indicates that the operating company did not relinquish possession of Foundation's assets at the expiration of the lease but continued to possess them until their sale to Resin in September 1956. Under what circumstances they did so, however, is not clear. The only evidence in the record which bears on the question are three letters which Foundation wrote to the operating company just prior and just subsequent to the expiration of the lease. These letters *194 indicate that Foundation considered the operating company to be a trespasser with respect to its assets and to be liable for damages by reason thereof. Insofar as we know, however, the operating company did not recognize such liability, nor did Foundation seek to enforce such liability until after the taxable years in question here. At the trial of these proceedings Sokol, Groves, and Oscar, the operating company's president, secretary, and general manager, respectively, all appeared as witnesses. We think it reasonable to assume that at least one, if not all three, of these individuals had knowledge relevant to this issue. Yet petitioners' counsel asked no questions of them with respect thereto. [9] This omission, we think, raises an inference that their testimony would not have been favorable to petitioners' contentions on this issue. Interstate Circuit v. United States, 306 U.S. 208, 226 (1939). Petitioners have failed to prove that the operating company was entitled to deduct, as damages, for its taxable years ending July 31, 1955 and 1956, the amounts it accrued on its books *195 and returns for those years as rents and royalties. The Internal Revenue Code of 1954, sec. 6901, provides a method of collecting the liability of a transferee of property for taxes of the transferor and defines the term "transferee" as used in the section to include "donee, heir, legatee, devisee, and distributee," which definition has been held to include a stockholder who received corporate assets on dissolution. Lime Cola Co., 22 T.C. 593 (1954); Leon G. Grieb, 36 T.C. 156 (1961). In a transferee proceeding in this Court the burden of proof is on respondent to show that a petitioner is liable as a transferee of property of the taxpayer, but not to show that the taxpayer was liable for the tax. Sec. 6902(a), I.R.C. 1954. The existence and extent of a transferee's liability must be determined under State law. Commissioner v. Stern, 357 U.S. 39 (1958). *196 Respondent refers us to California Civil Code, sections 3439.01, et seq., in support of his assertion of transferee liability. Section 3439.04 of that Code provides in part: Every conveyance made * * * by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made * * * without a fair consideration. Section 3439.09 provides that where a conveyance is fraudulent as to a creditor the creditor may have the conveyance set aside to the extent necessary to satisfy his claim. We think these provisions of the California law clearly make a stockholder who receives property on dissolution and complete liquidation of a corporation liable for the unpaid debts of the corporation to the extent of the value of the property so received. See, also, Leon G. Grieb, supra.
When the operating company distributed all of its assets to its stockholders on dissolution in May 1957 it became insolvent to the extent of any *197 unpaid tax liability due by it at that time. While the unpaid tax liability of the operating company at that time, if any, will have to be determined under Rule 50 in accordance with this opinion, we hold that petitioners Spencer, Walker, Weisbart, and Schochet are liable as transferees for any unpaid tax liability of the operating company to the extent of the amounts received by them upon liqudation of the operating company. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Oscar C. Stahl and Sylvia Stahl, Docket Nos. 79580, 79581; Irving Weisbart, Docket No. 79582; Richard L. Walker Docket No. 79583; E. R. Schochet, Docket No. 79584; and Mildred J. Spencer, Docket No. 79585.↩
1. Transferred to Harold Bartlett, January 18, 1952, and by him to Oscar, September 18, 1952, and by the latter to Irving Weisbart, May 20, 1956. From page A-102, Ex. 84-CG.
[2] Transferred to E. R. Schochet, December 28, 1956. Ex. 55-BD.
[3] Transferred to Irving Weisbart, 150 shares on September 13, 1955, and 50 shares on April 20, 1956. Ex. 85-CH.
[4]↩ Transferred to Irving Weisbart, April 20, 1956.
1. Annualized on basis that average of same 5 months for preceding and following year represented that short period's normal percentage of a full annual period.↩
5. The amount of gain was adjusted on their joint return for 1956 to reflect their agreement, with Foundation to accept less than the $820,000 called for.↩
6. See also Estate of James L. Hawley, T.C. Memo. 1961-38; Ralph M. Singer, T.C. Memo. 1963-158; Isis Windows, Inc., T.C. Memo. 1963-176↩.
7. The Internal Revenue Code of 1939 governs the operating company's taxable years and periods ending February 28, 1953 and 1954, and July 31, 1954. Sec. 7851, I.R.C. 1954↩. Its taxable years ending July 31, 1955 and 1956, are governed by the Internal Revenue Code of 1954.
8. The operating company appears to have operated at a loss during that part of the lease period, August 1, 1954, to February 28, 1955, covered by the 1954 Code, and would have accrued no rent for that period.↩
9. Sokol appeared as a witness for respondent pursuant to a subpoena. Petitioners, however, had the opportunity to make him their witness for purposes of testimony on this point.↩