Irving Don, et al., [1] v. Commissioner. Don v. Commissioner
Docket Nos. 5641-67, 5668-67 - 5670-67, 827-68.
United States Tax Court
T.C. Memo 1971-130; 1971 Tax Ct. Memo LEXIS 203; 30 T.C.M. (CCH) 565; T.C.M. (RIA) 71130; June 3, 1971, Filed Peter R. Stoll, for the petitioners in docket Nos. 5641-67, 5670-67 and 827-68. Harvey D. Tack, for the petitioners in docket Nos. 5668-67, 5669-67 and *204 5670-67. Marion Malone, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner made the following determinations of deficiency and addition to tax in petitioners' income tax: Addition to
tax,
Sec. 6653(b),
Petitioner
Year Ended
Deficiency
I.R.C. 1954
Invitation Dinners, Inc., Docket No.
5/31/62
$ 7,913.70
$ 3,956.85
5670-67
5/31/63
19,084.96
9,542.48
Irving Don, Docket No. 827-68
12/31/61
11,816.57
5,908.29
12/31/62
33,180.91
16,590.46
12/31/63
1,627.75
813.88
LeRoy Rodde, Docket No. 5669-67
12/31/62
6,727.43
3,363.72 The Commissioner further determined that petitioners Irving Don and LeRoy Rodde, as transferees of property of Invitation Dinners, Inc., were liable for the deficiencies and additions to tax determined to be due from Invitation Dinners, Inc., as follows: Addition to
tax,
Sec. 6653(b),
Petitioner
Year Ended
Deficiency
I.R.C. 1954
Irving Don, Docket No. 5641-67
5/31/62
$ 7,913.70
$ 3,956.85
5/31/63
19,084.96
9,542.48
LeRoy Rodde, Docket No. 5668-67
5/31/62
7,913.70
3,956.85
The following issues *205 remain for decision: (1) whether Invitation Dinners, Inc., Irving Don, and LeRoy Rodde all received unreported income as determined by the Commissioner; (2) whether legal expenses paid by Invitation Dinners, Inc., in defending one of its officers, Irving Don, from criminal prosecution are deductible by Invitation Dinners, Inc., and whether the payment of such expenses constituted income to petitioner Irving Don; (3) whether $6,394 paid by Invitation Dinners, Inc., to Earl J. Rodde in its taxable year ending May 31, 1963, were deductible "commissions"; (4) whether Irving Don received unreported income in the form of cash advances from Invitation Dinners, Inc., in 1961, 1962 and 1963; (5) whether Irving Don had business losses in 1961 and 1962; (6) whether all or part of the underpayment of tax by Invitation Dinners, Inc., Irving Don and LeRoy Rodde was due to fraud; and (7) whether Irving Don and LeRoy Rodde are liable as transferees for the tax and additions to tax asserted against Invitation Dinners, Inc. 566 Findings of Fact The parties have stipulated certain facts, which, together with the attached exhibits, are incorporated herein by this reference. Invitation Dinners, *206 Inc. ("Invitation"), was a California corporation. Though it is now defunct, its existence continues for the purposes of this case pursuant to section 5400 of the Corporation Code of California. At the time its petition was filed herein Invitation's principal office was at 919 Malcolm Avenue, Los Angeles, California, c/o LeRoy Rodde. It maintained its books and records on a cash method of accounting and filed its Federal corporate income tax returns (Form 1120) for the taxable years ending May 31, 1962, and May 31, 1963, with the district director of internal revenue, Los Angeles, California. Both Irving Don ("Don") and LeRoy Rodde ("Rodde") were legal residents of the State of California at the time of the filing of their petitions herein. Don maintained his books and records on a cash basis of accounting and filed Federal income tax returns (Form 1040) for calendar years 1961 and 1962 with the district director of internal revenue, Los Angeles, California. He did not file a Federal income tax return for the calendar year 1963. Rodde also maintained his books and records on a cash basis of accounting and filed his Federal income tax return (Form 1040) for the calendar year 1962 *207 with the district director of internal revenue, Los Angeles, California. Invitation was incorporated on June 26, 1961, by petitioners Rodde and Don and a person named Albert M. Sheppard ("Sheppard"). All three had theretofore resided in or near Chicago, Illinois, and had come to California in 1961 or, at most, a year or two prior thereto. Out of an authorized capital of 2,500 no par value shares, Rodde, Don and Sheppard (sometimes hereinafter referred to collectively as the "principals") were each issued 35 shares and became the corporation's sole stockholders. Rodde, Don, and Sheppard became, respectively, president, vice-president and secretary, and the three were also the only members of the board of directors. Invitation commenced its business in Los Angeles, California, during the last six months of 1961. Its operations were related to the promotion of restaurant businesses. It contracted with a number of popular restaurants in the organization of a "club." Originally the club had 26 participating restaurants. Each agreed to offer a free dinner upon presentation of a coupon issued by Invitation, provided that an identical dinner was purchased at the same time and at the regular *208 price. Invitation prepared a book of coupons, each coupon designating a participating restaurant and setting forth the menu which it offered as part of the plan. The public was then invited through advertising media to subscribe to membership in the club by buying a book of coupons from Invitation at $5 per book. The purchaser or subscriber was entitled to use the coupons at the various restaurants as he chose. For the participating restaurants the plan was intended to promote their image among the dining public, and thereby lead to future patronage by those persons who initially became acquainted with these restaurants through Invitation's dinner plan. Invitation received its income solely from the sale of its coupon books. It received no payments from the participating restaurants, nor did Invitation pay any part of the coupon book subscription price to these restaurants. Invitation's dinner program met with immediate success and it sold a large number of membership books throughout the Los Angeles area. Within a few months, it set up branch offices in San Diego and San Francisco, California. The San Francisco office was opened in January, 1962, and the San Diego office was opened *209 sometime in early 1962. Invitation also commenced similar operations in other cities, including Phoenix, Dallas, and New Orleans. Invitation's San Francisco office was operated by a manager named Harry E. Marcum ("Marcum"). He received both a salary and commissions, based on sales, for his work in the San Francisco office. There was also employed at the San Francisco office a person named Charlotte Smith ("Miss Smith"). Her duties consisted of general office work, which included preparing bank deposits, doing the banking for Invitation's San Francisco office, and assisting Marcum in maintaining records of sales and bank deposits. Sales of coupon books at the San Francisco office were made both by check and for cash. The check sales were largely those that were made to persons who responded by mail to newspaper advertisements. The cash sales were substantial in number, and were made to a considerable 567 extent through or to individual salesmen. The San Francisco office relied extensively on "direct salesmen" as well as the news media to promote its dinner plan to the public. The number of these salesmen varied from 25 to as many as 170. The salesmen acted as independent contractors; *210 they purchased coupon books from Invitation at reduced rates of $3.50 or $3.75 and resold the books to the public at the regular price of $5. It was Invitation's policy to request cash from the salesmen, and not to encourage salesmen to pay by check when they purchased coupon books. There was also a small number of cash sales made through the mail as well as to subscribers who came into Invitation's San Francisco office. The cash sales were treated differently from check sales on Invitation's San Francisco books and records. The San Francisco office did not keep a general ledger. However, in addition to payroll reports that office maintained weekly and daily summaries of sales. The "Weekly Summary Report of Sales" covered the period of time from the week ending January 20, 1962, through the week ending June 2, 1962, and was kept by Marcum for the first three or four weeks, and thereafter by Miss Smith. Besides accounting for the coupon books sold each day, these weekly summaries were also used as a method of inventory control. Different categories were employed to reflect whether coupon books were sold through the mail, at Invitation's office, from display racks, by salesmen, or *211 to groups; there were also categories covering books disposed of in other "[miscellaneous]" ways, as well as "Free Books" and "Complimentary Books." The "Complimentary Books" category was originally set up to reflect coupon books which were exchanged for advertising time on radio, as distinguished from "Free Books" which were given away in small numbers for no charge to "newspaper people," restaurant owners and other individuals. However, pursuant to instructions given to Marcum by one of the principals of Invitation Dinners, Inc., sales of coupon books for which cash was received were entered under "Complimentary Books" on the Weekly Summary Report of Sales. Thus, it was the procedure in Invitation's San Francisco office to enter cash sales as "Complimentary" and not to reflect any amount on the weekly reports for "Money" received from these sales. Cash sales were entered in this manner under "Complimentary Books" beginning on January 29, 1962 and ending on March 1, 1962, after which no cash sales were reflected under any category in the Weekly Summary Report of Sales. Sales of coupon books for which checks were received, on the other hand, were never entered under "Complimentary *212 Books," and were recorded under some other appropriated category on the Weekly Summary Report of Sales. Beginning on February 12, 1962, Miss Smith also kept a separate record pertaining only to cash sales. In this record she entered the number of books sold each day for cash, the amount of proceeds therefrom, Marcum's commissions on these sales, and a net figure less the commissions. [2] Miss Smith continued to enter cash sales in this record until June 9, 1962. The cash proceeds were also treated differently from the check proceeds in the banking practices *213 of Invitation's San Francisco office. During the early period of Invitation's business in San Francisco - from January 15, 1962, until January 26, 1962, - cash proceeds were included in Invitation's deposits to its San Francisco bank account at the Wells Fargo Bank. Invitation's San Francisco business during this period consisted mostly of sales of coupon books through the mail. It was Invitation's experience that comparatively little cash was received through the mail. Nonetheless, the cash deposits during this period amounted to $3,217 or approximately 14.9 percent of total sales. Then beginning on January 27, 1962, one business day before Invitation began to record its cash sales as "Complimentary Books" on its Weekly Summary Reports of Sales for SanFrancisco, Invitation did not make any more cash deposits to its bank account until June 19, 1962. During this period when Miss Smith prepared the deposit slips and made deposits to Invitation's account at the Wells Fargo Bank, she included only the checks and none of the cash received by Invitation. Don had instructed Marcum 568 to "[save]" the cash proceeds from Invitation's San Francisco office. He further instructed Marcum *214 to convert the cash into bills of large denominations. Marcum, therefore, had Miss Smith convert the cash into bills of $50 and $100 denomination and place the cash in a safe deposit box at the same Wells Fargo Bank branch where Invitation had its San Francisco bank account. Miss Smith visited the safe deposit box and placed the cash therein at the same time she made Invitation's regular deposits, which consisted only of the check proceeds. These bank deposits and safe deposit visits occurred approximately three times a week. There were, therefore, no cash deposits made to Invitation's bank account from January 27, 1962, until June 19, 1962. Furthermore, beginning on January 29, 1962, cash proceeds were not reflected on the Weekly Summary Report of Sales. Nonetheless during the period of time from February 12, 1962, through May 31, 1962 - in Invitation's taxable year ending May 31, 1962, - the record of cash sales kept by Miss Smith reflected a total of $28,492 in cash sales which were not recorded on Invitation's Weekly Summary Report of Sales in San Francisco. After Marcum's commissions were netted out, net cash sales not recorded during this period amounted to $26,663.75. [3] For *215 the period from June 1, 1962 through the last entry on June 9, 1962, - in Invitation's taxable year ending May 31, 1963, - the cash sales record revealed a total of $982 not reflected on the Weekly Summary. Net cash sales not recorded during this period amounted to $905. Don, Rodde and Sheppard, all of whom worked in the Los Angeles office, were kept informed of Invitation's San Francisco business in daily telephone conversations with Marcum or Miss Smith. Usually, Don, Rodde and Sheppard were on the telephone at the same time. During these daily conversations, Marcum or Miss Smith reported the number of books sold, the number of "Complimentary Books" or books sold for cash, the amount received from cash sales and the amount received from check sales. Besides these daily telephone communications, daily reports covering the same information were mailed to Don, Rodde and Sheppard at Invitation's Los Angeles office. Marcum *216 made trips to Los Angeles every two or three weeks to deliver the cash received in Invitation's San Francisco enterprise. On these occasions Miss Smith withdrew the cash which she had previously placed in the safe deposit box at Wells Fargo Bank and gave it to Marcum. At the Los Angeles office, Marcum met with all three principals, and gave the cash to them. Don, Rodde and Sheppard counted the money and checked the amount against the daily reports they had received by mail and over the telephone, which included reports of cash sales. Though the amount of cash varied with the frequency of Marcum's trips to Los Angeles, on the average he delivered from $2,000 to $3,000 each trip. On approximately two occasions, Don visited the San Francisco office and Miss Smith delivered the cash directly to him, and not to Marcum, after withdrawing it from the safe deposit box. The cash proceeds from the San Francisco office, which were brought to Los Angeles by Marcum or Don, were not deposited to Invitation's Los Angeles bank accounts, nor were they entered on its books and records kept in Los Angeles. There were also certain amounts of cash proceeds from Invitation's Los Angeles office which were *217 never recorded on the corporation's books or deposited to its bank accounts, as hereinafter explained. The sales records for Invitation's Los Angeles office consisted principally of a record of coupon book sales through the mail. Sometime around February or March, 1962, Invitation's general ledger was given to its accountant for keeping, and Invitation's books and records kept at its Los Angeles office were periodically sent thereafter to the accountant for posting. Invitation's sales in Los Angeles arose mainly from advertisements which invited coupon book purchases through the mail directly from Invitation. Most of these coupon book purchases were made by check. Nonetheless, Invitation's Los Angeles office did receive cash from several sources: from customers who came into the Los Angeles office to purchase coupon books; from salesmen who were independent contractors like the San Francisco salesmen; and also, in limited amounts, from mail subscriptions. 569 At least part of these cash receipts earned in Los Angeles was neither recorded on Invitation's books and records nor deposited to its bank accounts. Some of the cash proceeds received in Los Angeles through the mail *218 were turned over directly to Rodde. Furthermore, as noted above, the large amounts of cash earned in San Francisco and brought to Los Angeles were never recorded on any of Invitation's Los Angeles books and records or deposited to any of its bank accounts. As a consequence, those cash receipts were also never recorded on the general ledger, which reconciled with the income tax returns filed by Invitation. Thus, those cash receipts were not accounted for on the returns. The unrecorded cash receipts were diverted to Don, Rodde and Sheppard. In June, 1962, Don became involved in a criminal prosecution. The incident which gave rise to Don's arrest involved one of Invitation's former employees, James McCorvey ("McCorvey"). In early 1962 Invitation sent McCorvey to Seattle to organize a dining club for Invitation in that city. In Seattle, McCorvey severed his connection with Invitation and began a similar venture named the Seattle Supper Club of which he was a principal operator. The Seattle Supper Club enjoyed considerable success. McCorvey returned to San Francisco and visited Invitation's office on June 8, 1962. While at Invitation's office he disclosed the success of the Seattle *219 operation. This information was relayed to Don and Rodde in Southern California. Along with Sheppard they decided to send two men named Roberts and Sherbert to San Francisco allegedly to "negotiate a deal" with McCorvey whereby McCorvey's interest in the Seattle Supper Club might be acquired. Don had known Roberts casually in Chicago, and did not even know his last name. Roberts had once been a waiter, and the record fails to disclose that he had or that Don even thought he had any qualifications whatever to conduct negotiations for the purchase of a business. Sherbert was a friend of Roberts and was previously unknown to any of the three principals of Invitation. Roberts and Sherbert were not given any instructions as to any purchase price or as to any terms or conditions that might be relevant to a possible purchase of the Seattle Supper Club. McCorvey was not informed that these men were coming to see him. Don arranged for air transportation of Roberts and Sherbert to San Francisco on a plane leaving Los Angeles at 8:00 p.m. of the same day, June 8, 1962. Don had meanwhile telephoned Miss Smith and told her to meet Roberts and Sherbert at the San Francisco airport that evening and *220 provide them with an automobile, "a two-door dark, heavy car, hardtop." He also insturcted Miss Smith to arrange to have McCorvey in her apartment in the early morning hours of June 9, 1962. Miss Smith in fact met Roberts and Sherbert at the San Francisco airport that evening, drove them into the city, and turned over to them Marcum's Cadillac automobile which she had obtained for that purpose. On the trip into the city one of the two men forewarned Miss Smith that "[we] may have to rough you up, too." Later that evening, between about 11:00 and 12:00 o'clock, Miss Smith met McCorvey by prearrangement at his hotel room, and the two of them thereupon went to several night clubs or bars. Then, somewhat after 3:00 a.m., they went to Miss Smith's apartment. Shortly thereafter, Roberts and Sherbert entered the apartment. They pushed Miss Smith into a closet. They surprised McCorvey, robbed him of some $900, and attempted forcibly to take him to Los Angeles. The attempt was frustrated by McCorvey and the two men fled. Roberts and Sherbert were not bona fide business men sent to San Francisco to conduct legitimate business negotiations with McCorvey. They were in fact strongarm men who *221 were sent to San Francisco to confront and "deal" with McCorvey in an unlawful manner. Don was arrested in connection with this incident on June 13, 1962. On June 21, 1962, an indictment was returned against Don, Stanley Stone (an employee of Invitation), Roberts, and Sherbert. The indictment charged a conspiracy to commit robbery and kidnapping, and also the crime of robbery itself. A trial was had on the foregoing charges against Don and Stone in the Superior Court of California in and for the City and County of San Francisco, beginning April 2, 1963.Roberts and Sherbert had jumped bail and were not tried at that time. Don was found guilty and Stone not guilty on both counts. Don thereafter began to serve a sentence, either for life or for a term of years not clearly disclosed by the record herein. In 1964, the District Court of Appeal of the State of California reversed the conviction on the ground that certain improper hearsay testimony had been admitted at the trial. However, the facts set forth above are amply supported by separate admissible evidence in the transcript of testimony at that trial which was introduced as an exhibit in the present case in connection with the *222 570 "legal fees" issues herein, and are also supported at least in large part by other independent evidence in the record of this case. During the course of the criminal investigation, the Intelligence Division of the Internal Revenue Service ("IRS") was given information that cash was being withheld from income in Invitation's San Francisco office. The IRS, therefore, questioned Marcum at Invitation's San Francisco office, and Marcum turned over the San Francisco books to the IRS at that time. Sometime after his arrest, on June 13, 1962, Don went to San Francisco and took over the operation of Invitation's office thus leaving Rodde and Sheppard in charge of the Los Angeles office. Cash began to reappear, to some extent, in Invitation's San Francisco bank deposits beginning on June 19, 1962, only after this initial IRS investigation and after Don took over supervision of the San Francisco office. Marcum and Miss Smith cooperated with both State and Federal investigating authorities following the McCorvey incident, and their association with Invitation ceased sometime in June 1962. During their association with Invitation, both Don and Rodde made unexplained bank deposits as *223 hereinafter set forth. Don deposited $10,000 in cash to his personal bank account at the Security First National Bank in Los Angeles on October 24, 1961. This deposit was made up of eighty-two $100 bills and thirty-six $50 bills. He also deposited a check for $4,000 to Invitation's bank account on December 27, 1961. Neither of these deposits was identified as to source. Beginning at least in 1962, Don also had bank accounts at the Union Bank in North Hollywood, the Wells Fargo Bank in San Francisco, and the United California Bank, Nob Hill Branch, in San Francisco. From June 1, 1962, through January 3, 1963, Don made thirteen cash deposits to his personal bank accounts totalling $32,348, as follows: Amount of
Date
Bank
Currency
Denomination
6/ 1/62
Union Bank
$ 3,000
Unascertained
7/ 3/62
Wells Fargo Bank
648
Unascertained
8/15/62
United California Bank
3,000
Th2rty $100 bills
8/23/62
Wells Fargo Bank
2,400
Twenty-three $100 bills
Four $10 bills
Three $20 bills
8/24/62
United California Bank
1,000
Ten $100 bills
9/ 5/62
United California Bank
5,000
Fifty $100 bills
9/19/62
United California Bank
1,000
Six $100 bills
Eight $50 bills
10/ 9/62
United California Bank
10,000
One hundred $100 bills
10/12/62
Wells Fargo Bank
800
Unascertained
11/26/62
Wells Fargo Bank
500
Unascertained
12/ 5/62
Wells Fargo Bank
400
Unascertained
1/ 2/63
Wells Fargo Bank
600
Unascertained
1/ 3/63
United California Bank
4,000
Forty $100 bills
$32,348
*224 None of these deposits was satisfactorily identified or explained as to source. When the investigating agent of the Internal Revenue Service interviewed Don in 1965 and inquired as to the origin of these cash deposits, Don replied that they represented gambling winnings in Las Vegas. Thereupon, when advised that gambling winnings were taxable income, he recanted and stated that he came out even on gambling and couldn't remember where the money came from. On further questioning he indicated that he brought a "lot of cash" from Chicago. At the trial he attempted to show that he brought money with him from Chicago to California and that such funds were the source of the foregoing deposits. That testimony was unconvincing. He filed a financial statement with Union Bank dated November 30, 1961, in which his total cash assets were shown to be $6,375. Subsequently, on November 23, 1962, he filed another financial statement with the Union Bank in which he listed his total cash assets at $4,700. On June 27, 1962, Rodde deposited a check for $3,000 in his personal account at the Union Bank, North Hollywood Branch, and on August 16, 1962, he deposited a check for $3,000 in his personal checking *225 account at Ahmanson Bank, Beverly Hills, California. Although Rodde had assets which might have accounted for such deposits, he was 571 unable to explain the source of either of these deposits. Ultimately, Don became displeased with Rodde's and Sheppard's management of Invitation's Los Angeles office. He brought an action against them in Los Angeles Superior Court seeking damages, as well as an accounting and inspection of Invitation's books. In March 1963, Don and Sheppard sold their interests in Invitation to Rodde. 1.(a) Unreported income - Invitation. Th Commissioner determined that Invitation realized unreported income from cash sales totaling $26,027.70 and $48,348 for its taxable years ending May 31, 1962, and May 31, 1963, respectively. As set forth above, Invitation had unreported net cash sales in the amount of at least $26,663.75 for the fiscal year ending May 31, 1962. The $48,348 figure was based upon unexplained bank deposits allegedly made by Don and Rodde during Invitation's fiscal year ending May 31, 1963. Subsequent to the issuance of the notice of deficiency, deposits of $10,000 were explained, thereby leaving a total of $38,348 in controversy as to this *226 item. As set forth above in greater detail, Don in fact made unexplained bank deposits aggregating $32,348 and Rodde made unexplained bank deposits aggregating $6,000 during Invitation's fiscal year ending May 31, 1963. Petitioners have failed to establish that such unexplained deposits in the total amount of $38,348 did not have their source in unreported sales of Invitation as determined by the Commissioner. (b) Unreported income - Don. The Commissioner determined that Don had unreported income in the amounts of $14,000 and $32,348 for his taxable (calendar) years 1961 and 1962, respectively. These amounts represent Don's unexplained bank deposits, set forth above, and he has failed to establish that these amounts actually did not represent unreported income realized by him during those years. In addition, the record affirmatively establishes that he received in 1962 at least $8,887.92 (one-third of $26,663.75, see p. -, supra) as his share of Invitation's unreported cash sales in 1962 up to May 31, 1962, no portion of which was reported on his return. The Commissioner has not separately charged Don with this item, but has treated it as being covered by the unexplained bank deposits.
*227 (c) Unreported income - Rodde. The Commissioner determined that Rodde received $8,675.90 as his one-third pro rata share of cash diverted from Invitation in respect of the unreported cash sales described above. The total of such sales determined by the Commissioner was $26,027.70. However, the actual unreported cash sales divided among the three principals was in excess of that amount. See p. -, supra. Rodde in fact received one-third of those unreported cash sales in 1962. 2. Legal expenses - Don's criminal trial. In connection with Don's defense in his criminal trial referred to above Invitation paid legal and other expenses in the amounts of $7,129.50 between June 30, 1962 and September 21, 1962, and $5,025 between February 5, 1963 and April 18, 1963, - all within Invitation's fiscal year ending May 31, 1963. It deducted the total amount, $12,154.50, on its income tax return for that fiscal year. The Commissioner disallowed the deduction. Such expenditures did not constitute "ordinary and necessary" business expenses. Concomitantly with his determination against Invitation the Commissioner determined in his notice of deficiency against Don that the payment of these expenses *228 by Invitation constituted ordinary income to Don in the amounts of $7,129.50 for the calendar year 1962 and $5,025 for the calendar year 1963. These payments represented constructive dividends to Don. 3. Commission to Earl J. Rodde. Sometime in January or February, 1963, Don and Rodde's brother Earl J. Rodde ("Earl") went to New Orleans, Louisiana, to establish a dinner plan for Invitation in that city. Among the deductions claimed on Invitation's return for its taxable year ending May 31, 1963, was an item of $6,394, which it sought to defend as a "commission" to Earl. The Commissioner ruled in respect of this item as follows: (c) It is determined that a "commission" of $6,394.00, paid to Mr. Earl J. Rodde during the fiscal year ending May 31, 1963, and claimed as a deduction on the corporate return filed for that year, constitutes the repayment of a loan from Mr. Rodde, as opposed to the payment of compensation for services rendered. Therefore, taxable income is increased in the amount of $6,394.00. The record is devoid of any evidence to show that this $6,394 does not represent the repayment of a loan, rather than a "commission." The record also fails to show what, if any, *229 compensation Invitation paid to Earl, or whether, if it did pay him any compensation, such compensation was 572 related to or was wholly separate from this $6,394 item. 4. Cash "advances." The records of Invitation had an account for "advances to officers." This account reflected mostly Invitation's payment of Don's, Rodde's, and Sheppard's personal expenses. Some of the original entries relating to such payments were charged to salary subject to withholding. These entries were then scratched out and charged to the "advances" account. No notes were given in respect of the "advances," nor was any interest paid thereon. From time to time the salaries of the three officer-stockholders would be charged against the "advances" account. No repayments were ever made in respect of the balances in the "advances" account. In determining the deficiencies against the individual petitioners herein, the Commissioner included in Don's income the stipulated excess of the "advances" to him over his salary, namely, $1,486.16 for 1961, $16,294.39 for 1962, and $4,300 for 1963. Similarly, he has sought to include in Rodde's income for 1962 the stipulated excess of the "advances" over salary in *230 the revised amount of $15,626.71. The Commissioner determined that such excess constituted "additional compensation" both to Rodde and Don, respectively, in the foregoing amounts for years designated. Such excesses were not in fact bona fide loans, and actually represented additional compensation. 5. Business losses - Don. In his 1961 and 1962 returns Don claimed deductions for business losses in the amounts of $19,871.56 and $11,000, respectively. The Commissioner disallowed the deductions "because you have not established that you are entitled to such deductions." No evidence was presented in this Court that would support these claimed deductions. 6. Fraud. At least part of the underpayment of Invitation's tax required to be shown on its returns for each of its taxable years ending May 31, 1962, and May 31, 1963, was due to fraud. At least part of the underpayment of Don's tax for 1962 required to be shown on his return for that year was due to fraud. At least part of the underpayment of Rodde's tax for 1962 required to be shown on his return for that year was due to fraud. 7. Transferee liability. During Invitation's taxable year ending May 31, 1962, Don and Rodde each *231 received without consideration $8,887.92 which had been diverted from Invitation's San Francisco cash sales. During Invitation's taxable year ending May 31, 1963, Don received a total of not less than $12,456.17 from Invitation without consideration. This amount consists of two components: (a) $301.67, Don's one-third pro rata share of the $905 diverted San Francisco net cash sales for the period June 1, 1963 to June 9, 1963; and (b) $12,154.50 legal expenses paid on his behalf by Invitation. Invitation's income tax return for its fiscal year ending May 31, 1962, reported a net loss of $232.13, and contained a balance sheet reflecting the following assets and liabilities as of May 31, 1962: ASSETS
Cash
$59,261.49
Net receivables
71.28
Prepaid expenses and supplies
605.23
Net depreciable assets
2,960.79
Organization expense
282.14
Deposits
312.50
Total assets
$63,493.43
LIABILITIES AND CAPITAL
Notes and mortgages
$51,818.10
Payroll and withholding taxes
1,407.46
Total liabilities
$53,225.56
Capital stock - common
10,500.00 lEarned surplus
(loss)
(232.13)
Total liabilities an d capital
$63,493.43
The following *232 adjustments are required to make the foregoing balance sheet more accurate as of May 31, 1962: (a) The liabilities must be increased by $16,200 to reflect loans from each of Invitation's three officers of $5,000 each in December 1961, which were carried on the corporate books together with one year's interest at $5,400 each. The obligations to Don and Rodde and at least part of the obligation to Sheppard have never been discharged. (b) The liabilities must be further increased by the Federal income tax deficiency plus addition to tax in the total amount of $11,870.55 for the taxable year ending May 31, 1962, involved in these proceedings. With the foregoing adjustments, Invitation was insolvent on May 31, 1962, to the extent of $17,802.68, being the difference 573 between its assets of $63,493.43 and its revised liabilities of $81,296.11. Invitation's income tax return for its fiscal year ending May 31, 1963, reported a net loss of $18,970.15 in that taxable year and total losses, including a $232.13 net operating loss carryover from the previous year, of $19,202.28. Its return contained a balance sheet reflecting the following assets and liabilities: ASSETS
Cash
($10,867.97)
Net receivables
39,265.08
Prepaid expenses and supplies
650.00
Net depreciable assets
8,675.47
Organization expense
213.02
Deposits
722.50
Investment credit
336.74
Total assets
$38,994.84
LIABILITIES AND CAPITAL
Notes and mortgages
$40,202.80
Payroll withholding and sales tax
3,333.82
Travel plan trust payable
4,160.50
Total liabilities
$47,697.12
Capital stock - common
10,500.00
Earned surplus
(19,202.28)
Total liabilities and capital
$38,994.84
*233 The following adjustments are required to make that balance sheet more accurate as of May 31, 1963: (a) The liabilities must be increased by $15,000 to reflect additional loans of $5,000 each made by Don, Rodde and Sheppard in August 1962. These loans have not been repaid. (b) The liabilities must be further increased by $1,438.20 to reflect an obligation to Rodde in respect of certain of Rodde's funds that were used to discharge part of a debt owing by Invitation to Union Bank. (c) The liabilities must be increased by $2,900 to reflect an obligation to Rodde acquired by him on March 29, 1963, when he purchased a note held by Sheppard against the corporation. [4]
*234 (d) The liabilities must also be increased by Invitation's unpaid Federal income taxes and additions thereto for the fiscal year ending May 31, 1962, in the amount of $11,870.55, and for the fiscal year ending May 31, 1963, in the amount of $28,627.44 as reduced in accordance with the decision to be entered herein under Rule 50. Invitation was insolvent on May 31, 1963, in the amount of $8,702.28 pursuant to its balance sheet, and, when the foregoing adjustments are taken into account its insolvency on that date was substantially greater. Neither the diversions of Invitation's San Francisco cash sales nor the payment of Don's legal expenses were intended either to repay any part of any loans made to it by Invitation's officer-stockholders or to discharge any other obligation to them. Opinion RAUM, Judge: 1(a). Unreported income-Invitation. The Commissioner determined that Invitation failed to report substantial amounts of income on its returns for its taxable years ending May 31, 1962 and May 31, 1963. His determinations are based upon the unreported cash sales made at the San Francisco office during the first of the two fiscal years and upon the unexplained bank deposits *235 of Don and Rodde during the second of those years. There is ample evidence establishing affirmatively that there were unreported net cash sales during fiscal 1962 in an amount even greater than that ascribed to Invitation by the Commissioner, and his determination against the corporation in respect of that item for fiscal 1962 must be sustained. The situation is somewhat different for fiscal 1963. The record does not contain explicit evidence as to the total amount of unreported cash sales for that year. However, the Commissioner has attributed to the corporation income in the amount of $38,348 for fiscal 1963 on the ground that unexplained bank deposits made by Don (in the amount of $32,348) and Rodde (in the amount of $6,000) had their source in unreported income of the corporation which they had diverted to themselves. The bank deposits were fully established on this record, and no satisfactory explanation of their source was shown. In our opinion Don lied as to the source of his deposits. We had 574 no confidence whatever in his testimony, and there was no credible evidence that these deposits could have had their origin in any source other than Invitation. Rodde offered *236 no explanation as to the source of his deposits. While it is true that Rodde had assets that might have been the source of his $6,000 deposits, no evidence was presented to establish that these deposits were in fact attributable to such assets. In the circumstances, we must conclude that there has been a failure of proof as to this item, and the Commissioner's determination must be approved as to the entire $38,348 now in controversy. Cf. William O'Dwyer, 28 T.C. 698, 705, affirmed 266 F. 2d 575 (C.A. 4), certiorari denied, 361 U.S. 862; Hoefle v. Commissioner, 114 F. 2d 713, 714 (C.A. 6). 1(b). Unreported income - Don. The $32,348 unexplained bank deposits made by Don, discussed above, were made during the period June 1, 1962 - January 3, 1963. In addition the record establishes that Don made deposits in 1961 aggregating $14,000 which were not explained by credible evidence. The Commissioner seeks to include these amounts in Don's taxable income, $14,000 for 1961 and $32,348 for 1962. There has been a failure of proof as to these items and the Commissioner's determination is hereby approved in this respect. [5] See William O'Dwyer, supra; *237 Hoefle v. Commissioner, supra.
1(c). Unreported income - Rodde. The only item of unreported income charged to Rodde by the Commissioner was $8,675.90 for 1962. It represents Rodde's one-third pro-rata share of the $26,027.70 which the Commissioner determined to be Invitation's diverted San Francisco cash sales to May 31, 1962. As our findings show, the diverted cash sales and Rodde's one-third share were in fact in excess of these amounts, and we have no doubt on this record that Rodde received his share. We approve the Commissioner's determination. 2. Legal expenses - Don's criminal trial. During its fiscal year ending May 31, 1963, Invitation paid $12,154.50 in legal expenses in connection *238 with the criminal charges against Don described in our findings. Petitioner challenges the Commissioner's disallowance of a deduction in that amount which it had claimed, and it relies primarily upon Commissioner v. Tellier, 383 U.S. 687. We think its reliance is misplaced. At most, Tellier holds merely that a deduction for an expenditure for legal fees and the like which otherwise meets the statutory test as an "ordinary and necessary" business expense is not to be disallowed on grounds of "public policy" except in certain limited situations. 383 U.S. at 692-694. To qualify for deduction, the expenditure must still satisfy the statutory requirement that it was an "ordinary and necessary" expense in carrying on the taxpayer's trade or business, cf. Nadiak v. Commissioner, 356 F. 2d 911, 912 (C.A. 2), [6] and the burden in this respect is upon the taxpayer. Welch v. Helvering, 290 U.S. 111, 115. *239 We have little doubt on this record that the Commissioner's determination must be approved as to this item. On the evidence before us, we completely reject the notion that Roberts and Sherbert were sent to San Francisco to "negotiate" a business deal with McCorvey on behalf of Invitation. There is not even a suggestion that they were businessmen, or were even thought to be fitted in any way to represent Invitation as bona fide negotiators. To the contrary, it is plain, except perhaps to the hopelessly naive, that they were thugs, dispatched to San Francisco to engage in acts of violence upon the unsuspecting McCorvey. And the deductibility of expenses related thereto, including legal expenses, must be determined in the light of the origin and character of the activity out of which they arose. Cf. United States v. Gilmore, 372 U.S. 39, 45-48. Accordingly, it is plain that the legal expenses incurred in the defense against the criminal charges growing out of the foregoing episode, can hardly qualify as 575 "ordinary and necessary" expenses incurred in carrying on Invitation's business under section 162(a), I.R.C. 1954. Far from being "ordinary" *240 these expenses were "in a high degree extraordinary." (See Welch v. Helvering, supra, 290 U.S. at 114.) Moreover, they were Don's personal expenses and were in any event not proximately related to Invitation's business. The deduction was properly disallowed. The Commissioner made corresponding adjustments to Don's 1962 and 1963 income taxes, attributing to him those portions of the $12,154.50 paid on his behalf by Invitation in 1962 and 1963, respectively. What we have said above plainly requires that the Commissioner's determination be approved in this respect also. They were constructive dividends to him. Indeed, even if the deduction were to be allowed to Invitation, the payment of these expenses on Don's behalf would still constitute a taxable benefit to him for which he must account. 3. Commission to Earl J. Rodde. The Commissioner disallowed a deduction of $6,394 claimed by Invitation for its taxable year ending May 31, 1963, as a "commission" to Earl J. Rodde, the brother of petitioner LeRoy Rodde. The Commissioner determined that this amount constituted the "repayment of a loan" from Earl, as opposed to the payment of compensation for services rendered. The *241 only evidence of consequence on this issue was the following testimony given by Don: Q. O.K. By the way, the subject of Mr. Earl Rodde. The company paid him commissions, did they not? Invitation Dinners paid him commissions for the restaurants he signed up and for the books he sold? A. Yes, I think they did. There was no evidence as to the amount of any compensation paid to Earl, and no evidence that the $6,394 was in any way related to such compensation rather than the repayment of a loan as determined by the Commissioner. This issue must be decided against Invitation for failure to carry its burden of proof. 4. Cash "advances." The Commissioner determined that the excess of cash "advances" over salary that was charged against such advances constituted "additional compensation" to Rodde and Don in the respective amounts attributable to each. Rodde has conceded this issue in his case, but the matter is still in controversy in Don's case. In our opinion there has been a complete failure of proof and the Commissioner's determination against Don on this issue must be approved. Don's contention that there is an overlap between these "advances" and his unexplained bank deposits *242 is without merit. Since the "advances" were primarily in the form of Invitation's payment of his personal expenses, such payments could not have accounted for any part of the unexplained bank deposits. And to the extent that a minor portion of the "advances" may have been made directly to Don in cash, the record is utterly devoid of any evidence to establish that such portion formed any part of the unexplained bank deposits. 5. Business losses - Don. The Commissioner's disallowance of deductions for business losses claimed by Don for 1961 and 1962 in the respective amounts of $19,871.56 and $11,000 must be sustained for failure of proof. The record contains no evidence establishing any such losses. 6. Fraud. In addition to the basic deficiencies against Invitation for its fiscal years 1962 and 1963, against Rodde for 1962, and against Don for 1961, 1962 and 1963, the Commissioner determined additions to tax for fraud under section 6653 (b), I.R.C. 1954, in respect of each of the deficiencies for each of the respective years involved. The burden of proving fraud is upon the Commissioner and it must be carried by "clear and convincing" evidence. Kreps v. Commissioner, 351 F. 2d 1, 7 *243 (C.A. 2). However, the statute makes plain that the addition for fraud is applicable if "any part" of the understatement is due to fraud, and the Commissioner's burden is satisfied as to any particular year if he establishes fraud merely as to part of the basic deficiency for that year. And where the basic deficiency itself is approved merely because the taxpayer has failed to carry his own burden as to the underlying liability, such failure of proof is not sufficient to satisfy the Commissioner's burden of proving fraud. In such circumstances, both parties may fail in carrying their respective burdens. Cf. Drieborg v. Commissioner, 225 F. 2d 216 (C.A. 6). Bearing these considerations in mind we have found fraud against Invitation for each of its two taxable years in issue, against Rodde for the only year before us involving his taxes, and against Don for 1962, but not for 1961 or 1963 which are also before us in respect of his taxes. The evidence was strong and convincing that cash sales at the San Francisco branch were being withheld, that false and misleading 576 entries were made in its records, that all three of the principals of Invitation (including the *244 two individual petitioners herein) were informed daily by telephone and written reports as to such sales, that the cash from these sales was converted into large bills, that these bills were delivered to all three principals every two or three weeks at Los Angeles, that the cash was not deposited in Invitation's bank accounts, and that it never found its way into the corporate books or tax returns. Here indeed was "clear and convincing evidence" of fraud. Such evidence amply supports the Commissioner's addition to tax for fraud in respect of Invitation's fiscal year ending May 31, 1962. However, the same direct evidence as to fraudulent withholding of cash sales in the following fiscal year is before us only up to June 9, 1963, and involves only $905 net cash sales for that 9-day period. Although this comparatively small sum might not be impressive standing alone, the evidence as to fraud in respect thereof is strong and clear when considered in the context of this case, as part of a continuing fraudulent scheme of much larger dimensions. Accordingly, we have found fraud against Invitation for each of its fiscal years before us, [7] notwithstanding that we were unable to find fraud *245 in respect of other items that played a part in the basic deficiency for the second of the two years. The same materials involving the San Francisco cash sales that we took into account in finding fraud against Invitation are likewise applicable to the individual petitioners. The evidence is strong that each of them knowingly participated in the venture and that each received his share. Accordingly, we approve the Commissioner's addition for fraud against both Don and Rodde for 1962, the only calendar year covered by this evidence. The situation is otherwise, however, as to Don for the years 1961 and 1963. The only items in those years which might be thought to be fraud items are the unexplained deposits and the excess cash "advances" over salary. *246 Although it is quite possible that there may have been fraud as to such items, the record does not establish it. We have held Don accountable for the unexplained deposits, but we have done so because of his failure of proof. That is not enough to establish fraud. Nor do we think the evidence is sufficiently "clear and convincing" to prove fraud with respect to the "advances" or any of the other components of the basic deficiences for 1961 and 1963. Accordingly, we have not made any finding of fraud against Don for 1961 or 1963. 7. Transferee liability. The burden of proving transferee liability is on the Commissioner. Section 6902, I.R.C. 1954. We think the Commissioner has established that the individual petitioners Irving Don and LeRoy Rodde are liable as transferees of property of Invitation to the extent hereinafter noted. Section 6901(a)(1)(A), I.R.C. 1954. The "existence and extent" of transferee liability is determined by state law. Commissioner v. Stern, 357 U.S. 39, 45; Archie A. Swinks, 51 T.C. 13, 17. The rights of creditors under California law to pursue property transferred by their debtors *247 are authorized by sections 3439.01, et seq., Civil Code of California. [8] Don and Rodde have each made several arguments related to the Commissioner's determination of their respective transferee liabilities. Rodde argues that the Commissioner has established neither that Invitation was insolvent at the time the transfers were made to him nor that Invitation was rendered insolvent thereby. He directs our attention away from Invitation's balance sheet as of May 31, 1962 (at the end of its taxable year), and to an unverified balance sheet as of December 31, 1961. Since the December 31, 1961, balance sheet reflected an excess of assets over liabilities in the amount of $42,165.14, Rodde contends that the Commissioner has not established that Invitation was insolvent *248 at the time of every transfer made to Rodde in Invitation's taxable year ending May 31, 1962. He presumably intends this argument to show that the Government has not carried its burden of proof on this issue. We disagree. 577 Invitation's balance sheet as of December 31, 1961, is not a completely reliable reflection of the corporation's financial situation at that date. No provision was made in this balance sheet either for Don's, Rodde's or Sheppard's salaries, or for Federal income taxes. But even if the balance sheet were wholly trustworthy, we think petitioner Rodde's argument must fail. The balance sheet of December 31, 1961, would merely reflect the corporation's solvency at a time prior to the opening of Invitation's San Francisco office in January, 1962. Most of the unreported cash generated by Invitation's operations - which was diverted to Don, Rodde and Sheppard - came from the San Francisco office. The balance sheet of December 31, 1961, is simply not material to the repeated diversions of large amounts of cash during this later period. But more fundamentally, we think Rodde's argument overlooks that the transfers in question were part of a larger continuing scheme *249 of diverting Invitation's cash receipts to Don, Rodde and Sheppard, which diversions ultimately rendered the corporation insolvent. Where the transferor's insolvency results from a planned series of transfers, the transferee is liable irrespective of the particular moment at which the transferor lapsed into insolvency, provided only that insolvency results no later than at the end of the series of transfers. Cf. Aurore B. Benoit, 25 T.C. 656, 665, vacated and remanded on another issue, 238 F. 2d 485 (C.A. 1); Borall Corporation v. Commissioner, 167 F. 2d 865, 870 (C.A. 2), affirming a Memorandum Opinion of this Court dated October 30, 1946, 5 T.C.M. 933; Botz v. Helvering, 134 F. 2d 538, 543 (C.A. 8), affirming 45 B.T.A. 970. [9] We think that principle is applicable to the particular circumstances of this case also. Rodde also argues that the cash diversions he received from Invitation were in repayment of loans made by him to the corporation. But regardless of whether a preexisting debt may *250 be sufficient consideration for a transfer of property so as to preclude any transferee liability under California law and under our prior cases, we have found that these loans were never repaid. The cash diversions in question did not in fact represent any repayment of Rodde's loans to Invitation. We similarly regard without merit the further contention that in determining Invitation's solvency we must disregard an outstanding loan obligation to Union Bank in the amount of $40,000-$50,000 because it was fully secured by the personal guarantees of Don, Rodde and Sheppard. There has been no showing that Invitation, as the prime obligor of the loan, would not have become correspondingly liable to Don, Rodde and Sheppard, if their personal guarantees had been called by Union Bank. Accordingly, this case is quite different from those California cases cited in this connection. [10] We think it is therefore necessary to consider the Union Bank loan in determining Invitation's solvency and have done so. *251 We do note, however, that Rodde's transferee liability is limited to the value of Invitation's property transferred to him. In Invitation's taxable year ending May 31, 1962, we have found that Rodde received without consideration $8,887.92, or one-third of $26,663.75, in unreported income diverted from Invitation. His transferee liability is limited to that amount plus interest as provided by law. See Leo L. Lowy, 35 T.C. 393, 395-396. In Don's case we have found that Don similarly received $8,887.92, or one-third of the San Francisco cash sales in Invitation's fiscal year ending May 31, 1962, and 578 that he also received without consideration $12,456.17 from Invitation during its following fiscal year. We have not included any of Don's unexplained bank deposits, because we have attributed them to him as unreported income from Invitation only by reason of his failure of proof. In the case of transferee liability the burden is upon the Government, and we cannot accept Don's failure of proof as satisfying the Government's burden in respect of transferee liability. The situation is similar to that considered in connection with the fraud issue. Accordingly, Don is *252 liable as a transferee of Invitation in respect of its tax liability for fiscal 1962 to the extent of $8,887.92 plus interest as provided by law, and in respect of its tax liability for fiscal 1963 to the extent of $12,456.17 plus interest as provided by law. The liability of the two transferees is several. Phillips v. Commissioner, 283 U.S. 589, 603; Robert L. Harrison Estate, 16 T.C. 727, 731. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: LeRoy Rodde, docket Nos. 5668-67 and 5669-67; Invitation Dinners, Inc., docket No. 5670-67; and Irving Don, docket No. 827-68.↩
2. The number of cash sales reflected as "Complimentary Books" on the Weekly Summary Report of Sales was identical to the number of cash sales recorded on the cash sales record kept by Miss Smith beginning on February 12, 1962, except for three instances. On February 12, 1962, the first day entries were made to both records, a different number for cash sales was entered in each record. On February 21 and 24, 1962, the cash sales were listed on the Weekly Summary under "Advertising"; but here again, the number of sales so entered was identical to the number of cash sales recorded for those days on the cash sales record.↩
3. According to the cash sales record there was a total net cash sales during this period of $26,458.75. However, there were several errors in subtraction of Marcum's commissions from the cash sales, and the total of net cash sales was in fact $26,663.75.↩
4. Sheppard's note was one of three $5,400 notes which the corporation had issued in December, 1961, to its three officer-stockholders in connection with their loans of $5,000 each to the corporation. See p. -, supra. Invitation's liability to Don and Rodde in respect of the loans which they had made at that time is reflected in the balance sheet above in the "net receivables" item (through reduction of receivables by the amount of its obligation to Don and Rodde for those loans). The record does not explain why its obligation to Sheppard was not similarly treated nor does it adequately explain why the obligation on its note to him was reduced to $2,900.↩
5. We note that the $32,348 figure includes two deposits in the aggregate amount of $4,600 made on January 2 and January 3, 1963. However, these dates are so close to the end of the calendar year 1962 that a fair inference could arise that they had their source in 1962 income. No issue was presented to us in this connection, but in any event the burden was on petitioner to establish that his $4,600 could not be attributed to 1962 income, and that burden has not been carried.↩
6. Although Nadiak was decided by thesecond Circuit shortly before the Supreme Court's decision in Tellier, it was decided after the Second Circuit's own decision in Tellier which was affirmed by the Supreme Court, and which made clear that legal expenses "are deductible where they arise out of and are immediately or proximately connected with, and are required for, the conduct of a trade or business." (Emphasis supplied.) 342 F. 2d 690, 695↩.
7. That the fraud of Invitation's officer-stockholders may be imputed to it in such circumstances is well established. See, e. g., Ace Tool & Eng., Inc., 22 T.C. 833, 841-842. Petitioner's reliance in this connection upon Botwinik Brothers of Mass., Inc., 39 T.C. 988↩, is misplaced. The decision in that case turned upon the unusual facts which were there before us, as we were careful to point out at pp. 997-998.
8. Section 3439.04 deems every conveyance made "by a person who is or will be thereby rendered insolvent" to be fraudulent. Further, where a conveyance is fraudulent as to a creditor, section 3439.09 provides that, within certain limits not here applicable, the creditor may have the conveyance set aside to the extent necessary to satisfy his claim. See Oscar C. Stahl, T.C. Memo. 1963-201, 22 T.C.M. 996↩.
9. We made precisely this same point in Burton Ginsberg, T.C. Memo. 1965-36↩, T.C.M. 195, 201.
10. Rodde cites Fross v. Wotton, 3 Cal. 2d 384, 388, 44 P. 2d 350, 351-352, and Kirkpatrick v. Towers, 60 Cal. App. 2d 251, 140 P. 2d 681, 685. In Fross the promissory note in question was secured by a deed of trust on certain real property the beneficial ownership of which was in the debtors. It was suggested there that the holder of the secured note must prove the debtor insolvent by showing that the security of the note was impaired. As long as the value of the property securing the note was greater than the indebtedness, the creditor on the note could not complain that transfers of other property should be deemed fraudulent as to him, under the provisions of California law. Section 3442, California Civil Code, repealed by California Stats. 1939, C. 329, p. 1667, section 1, and replaced in part by section 3439.04 Civil Code of California (see footnote 8, p. -, supra). Kirkpatrick is similar except that in that case one of the debtors had no interest in the property securing the note. However, the California District Court of Appeal noted that this debtor's "transfers did not endanger the mortgage security" since the value of the property securing the note exceeded the indebtedness and this debtor was only a secondary obligor. Kirkpatrick v. Towers, 60 Cal. App. 2d, 251, 258-259, 140 P. 2d 681, 685↩. In both Fross and Kirkpatrick the note was secured by an asset of the debtor (except as explained hereinabove). The security for the Union Bank loan, in the case before us, was not secured by an asset of Invitation but by the personal guarantees of its stockholders, to whom Invitation would presumably be liable if the guarantees were enforced.